# REPUBLIC OF ARGENTINA ET AL. *v.* WELTOVER, INC., ET AL.

No. 91–763.   Argued April 1, 1992—Decided June 12, 1992

SCALIA, J., delivered the opinion for a unanimous Court.

*Richard J. Davis* argued the cause for petitioners. With him on the briefs were *Steven Alan Reiss, Bonnie Garone,* and *Andreas F. Lowenfeld.*

*Richard W. Cutler* argued the cause for respondents. With him on the brief was *Joel I. Klein.*

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Roberts, Douglas Letter,* and *Edwin D. Williamson.*

JUSTICE SCALIA delivered the opinion of the Court.

This case requires us to decide whether the Republic of Argentina's default on certain bonds issued as part of a plan to stabilize its currency was an act taken "in connection with a commercial activity" that had a "direct effect in the United States" so as to subject Argentina to suit in an American court under the Foreign Sovereign Immunities Act of 1976, 28 U. S. C. § 1602 *et seq.*

I

Since Argentina's currency is not one of the mediums of exchange accepted on the international market, Argentine businesses engaging in foreign transactions must pay in United States dollars or some other internationally accepted currency. In the recent past, it was difficult for Argentine borrowers to obtain such funds, principally because of the instability of the Argentine currency. To address these problems, petitioners, the Republic of Argentina and its central bank, Banco Central (collectively Argentina), in 1981 instituted a foreign exchange insurance contract program (FEIC), under which Argentina effectively agreed to assume the risk of currency depreciation in cross-border transactions involving Argentine borrowers. This was accomplished by Argentina's agreeing to sell to domestic borrowers, in exchange for a contractually predetermined amount of local currency, the necessary United States dollars to repay their foreign debts when they matured, irrespective of intervening devaluations.

Unfortunately, Argentina did not possess sufficient reserves of United States dollars to cover the FEIC contracts as they became due in 1982. The Argentine Government thereupon adopted certain emergency measures, including refinancing of the FEIC-backed debts by issuing to the creditors government bonds. These bonds, called "Bonods," provide for payment of interest and principal in United States dollars; payment may be made through transfer on the London, Frankfurt, Zurich, or New York market, at the election

of the creditor. Under this refinancing program, the foreign creditor had the option of either accepting the Bonods in satisfaction of the initial debt, thereby substituting the Argentine Government for the private debtor, or maintaining the debtor/creditor relationship with the private borrower and accepting the Argentine Government as guarantor.

When the Bonods began to mature in May 1986, Argentina concluded that it lacked sufficient foreign exchange to retire them. Pursuant to a Presidential Decree, Argentina unilaterally extended the time for payment and offered bondholders substitute instruments as a means of rescheduling the debts. Respondents, two Panamanian corporations and a Swiss bank who hold, collectively, $1.3 million of Bonods, refused to accept the rescheduling and insisted on full payment, specifying New York as the place where payment should be made. Argentina did not pay, and respondents then brought this breach-of-contract action in the United States District Court for the Southern District of New York, relying on the Foreign Sovereign Immunities Act of 1976 as the basis for jurisdiction. Petitioners moved to dismiss for lack of subject-matter jurisdiction, lack of personal jurisdiction, and *forum non conveniens.* The District Court denied these motions, 753 F. Supp. 1201 (1991), and the Court of Appeals affirmed, 941 F. 2d 145 (CA2 1991). We granted Argentina's petition for certiorari, which challenged the Court of Appeals' determination that, under the Act, Argentina was not immune from the jurisdiction of the federal courts in this case. 502 U. S. 1024 (1992).

II

The Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U. S. C. § 1602 *et seq.,* establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state. Under the Act, a "foreign state *shall* be immune from the jurisdiction of the courts of the United States and of the

States" unless one of several statutorily defined exceptions applies. § 1604 (emphasis added). The FSIA thus provides the "sole basis" for obtaining jurisdiction over a foreign sovereign in the United States. See *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U. S. 428, 434–439 (1989). The most significant of the FSIA's exceptions—and the one at issue in this case—is the "commercial" exception of § 1605(a)(2), which provides that a foreign state is not immune from suit in any case

> "in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." § 1605(a)(2).

In the proceedings below, respondents relied only on the third clause of § 1605(a)(2) to establish jurisdiction, 941 F. 2d, at 149, and our analysis is therefore limited to considering whether this lawsuit is (1) "based . . . upon an act outside the territory of the United States"; (2) that was taken "in connection with a commercial activity" of Argentina outside this country; and (3) that "cause[d] a direct effect in the United States."[1] The complaint in this case alleges only one cause of action on behalf of each of the respondents, viz., a breach-of-contract claim based on Argentina's attempt to refinance the Bonods rather than to pay them according to their terms. The fact that the cause of action is in compliance with the first of the three requirements—that it is "based upon an act outside the territory of the United

---

[1] It is undisputed that both the Republic of Argentina and Banco Central are "foreign states" within the meaning of the FSIA. See 28 U. S. C. §§ 1603(a), (b) ("[F]oreign state" includes certain "agenc[ies] or instrumentalit[ies] of a foreign state").

States" (presumably Argentina's unilateral extension)—is uncontested. The dispute pertains to whether the unilateral refinancing of the Bonods was taken "in connection with a commercial activity" of Argentina, and whether it had a "direct effect in the United States." We address these issues in turn.

## A

Respondents and their *amicus,* the United States, contend that Argentina's issuance of, and continued liability under, the Bonods constitute a "commercial activity" and that the extension of the payment schedules was taken "in connection with" that activity. The latter point is obvious enough, and Argentina does not contest it; the key question is whether the activity is "commercial" under the FSIA.

The FSIA defines "commercial activity" to mean:

> "[E]ither a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U. S. C. § 1603(d).

This definition, however, leaves the critical term "commercial" largely undefined: The first sentence simply establishes that the commercial nature of an activity does *not* depend upon whether it is a single act or a regular course of conduct; and the second sentence merely specifies what element of the conduct determines commerciality (*i. e.,* nature rather than purpose), but still without saying what "commercial" means. Fortunately, however, the FSIA was not written on a clean slate. As we have noted, see *Verlinden B. V.* v. *Central Bank of Nigeria,* 461 U. S. 480, 486–489 (1983), the Act (and the commercial exception in particular) largely codifies the so-called "restrictive" theory of foreign sovereign immunity first endorsed by the State Department in 1952. The meaning of "commercial" is the meaning generally attached to that

term under the restrictive theory at the time the statute was enacted. See *McDermott Int'l, Inc.* v. *Wilander*, 498 U. S. 337, 342 (1991) ("[W]e assume that when a statute uses [a term of art], Congress intended it to have its established meaning"); *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 329 (1981); *Morissette* v. *United States*, 342 U. S. 246, 263 (1952).

This Court did not have occasion to discuss the scope or validity of the restrictive theory of sovereign immunity until our 1976 decision in *Alfred Dunhill of London, Inc.* v. *Republic of Cuba*, 425 U. S. 682. Although the Court there was evenly divided on the question whether the "commercial" exception that applied in the foreign-sovereign-immunity context also limited the availability of an act-of-state defense, compare *id.*, at 695–706 (plurality opinion), with *id.*, at 725–730 (Marshall, J., dissenting), there was little disagreement over the general scope of the exception. The plurality noted that, after the State Department endorsed the restrictive theory of foreign sovereign immunity in 1952, the lower courts consistently held that foreign sovereigns were not immune from the jurisdiction of American courts in cases "arising out of purely commercial transactions," *id.*, at 703, citing, *inter alia, Victory Transport, Inc.* v. *Comisaria General*, 336 F. 2d 354 (CA2 1964), cert. denied, 381 U. S. 934 (1965), and *Petrol Shipping Corp.* v. *Kingdom of Greece*, 360 F. 2d 103 (CA2), cert. denied, 385 U. S. 931 (1966). The plurality further recognized that the distinction between state sovereign acts, on the one hand, and state commercial and private acts, on the other, was not entirely novel to American law. See 425 U. S., at 695–696, citing, *inter alia, Parden* v. *Terminal Railway of Alabama Docks Dept.*, 377 U. S. 184, 189–190 (1964) (Eleventh Amendment immunity); *Bank of United States* v. *Planters' Bank of Georgia*, 9 Wheat. 904, 907–908 (1824) (same); *New York* v. *United States*, 326 U. S. 572, 579 (1946) (opinion of Frankfurter, J.) (tax immunity of States); and *South Carolina* v. *United States*, 199 U. S. 437, 461–463 (1905) (same). The plurality

stated that the restrictive theory of foreign sovereign immunity would not bar a suit based upon a foreign state's participation in the marketplace in the manner of a private citizen or corporation. 425 U. S., at 698–705. A foreign state engaging in "commercial" activities "do[es] not exercise powers peculiar to sovereigns"; rather, it "exercise[s] only those powers that can also be exercised by private citizens." *Id.*, at 704. The dissenters did not disagree with this general description. See *id.*, at 725. Given that the FSIA was enacted less than six months after our decision in *Alfred Dunhill* was announced, we think the plurality's contemporaneous description of the then-prevailing restrictive theory of sovereign immunity is of significant assistance in construing the scope of the Act.

In accord with that description, we conclude that when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," 28 U. S. C. § 1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce," Black's Law Dictionary 270 (6th ed. 1990). See, *e. g.*, *Rush-Presbyterian-St. Luke's Medical Center* v. *Hellenic Republic*, 877 F. 2d 574, 578 (CA7), cert. denied, 493 U. S. 937 (1989). Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a "commercial" activity, because private companies can similarly use sales contracts

to acquire goods, see, *e. g., Stato di Rumania* v. *Trutta,* [1926] Foro It. I 584, 585–586, 589 (Corte di Cass. del Regno, Italy), translated and reprinted in part in 26 Am. J. Int'l L. 626–629 (Supp. 1932).

The commercial character of the Bonods is confirmed by the fact that they are in almost all respects garden-variety debt instruments: They may be held by private parties; they are negotiable and may be traded on the international market (except in Argentina); and they promise a future stream of cash income. We recognize that, prior to the enactment of the FSIA, there was authority suggesting that the issuance of public debt instruments did not constitute a commercial activity. *Victory Transport,* 336 F. 2d, at 360 (dicta). There is, however, nothing distinctive about the state's assumption of debt (other than perhaps its purpose) that would cause it always to be classified as *jure imperii,* and in this regard it is significant that *Victory Transport* expressed confusion as to whether the "nature" or the "purpose" of a transaction was controlling in determining commerciality, *id.,* at 359–360. Because the FSIA has now clearly established that the "nature" governs, we perceive no basis for concluding that the issuance of debt should be treated as categorically different from other activities of foreign states.

Argentina contends that, although the FSIA bars consideration of "purpose," a court must nonetheless fully consider the *context* of a transaction in order to determine whether it is "commercial." Accordingly, Argentina claims that the Court of Appeals erred by defining the relevant conduct in what Argentina considers an overly generalized, acontextual manner and by essentially adopting a *per se* rule that all "issuance of debt instruments" is "commercial." See 941 F. 2d, at 151 ("'[I]t is self-evident that issuing public debt is a commercial activity within the meaning of [the FSIA]'"), quoting *Shapiro* v. *Republic of Bolivia,* 930 F. 2d 1013, 1018 (CA2 1991). We have no occasion to consider such a *per se* rule, because it seems to us that even in full context, there

is nothing about the issuance of these Bonods (except perhaps its purpose) that is not analogous to a private commercial transaction.

Argentina points to the fact that the transactions in which the Bonods were issued did not have the ordinary commercial consequence of raising capital or financing acquisitions. Assuming for the sake of argument that this is not an example of judging the commerciality of a transaction by its purpose, the ready answer is that private parties regularly issue bonds, not just to raise capital or to finance purchases, but also to refinance debt. That is what Argentina did here: By virtue of the earlier FEIC contracts, Argentina was *already* obligated to supply the United States dollars needed to retire the FEIC-insured debts; the Bonods simply allowed Argentina to restructure its existing obligations. Argentina further asserts (without proof or even elaboration) that it "received consideration [for the Bonods] in no way commensurate with [their] value," Brief for Petitioners 22. Assuming that to be true, it makes no difference. Engaging in a commercial act does not require the receipt of fair value, or even compliance with the common-law requirements of consideration.

Argentina argues that the Bonods differ from ordinary debt instruments in that they "were created by the Argentine Government to fulfill its obligations under a foreign exchange program designed to address a domestic credit crisis, and as a component of a program designed to control that nation's critical shortage of foreign exchange." *Id.*, at 23–24. In this regard, Argentina relies heavily on *De Sanchez* v. *Banco Central de Nicaragua,* 770 F. 2d 1385 (1985), in which the Fifth Circuit took the view that "[o]ften, the essence of an act is defined by its purpose"; that unless "we can inquire into the purposes of such acts, we cannot determine their nature"; and that, in light of its purpose to control its reserves of foreign currency, Nicaragua's refusal to honor a check it had issued to cover a private bank debt was a

sovereign act entitled to immunity. *Id.*, at 1393. Indeed, Argentina asserts that the line between "nature" and "purpose" rests upon a "formalistic distinction [that] simply is neither useful nor warranted." Reply Brief for Petitioners 8. We think this line of argument is squarely foreclosed by the language of the FSIA. However difficult it may be in some cases to separate "purpose" (*i. e.*, the *reason* why the foreign state engages in the activity) from "nature" (*i. e.*, the outward form of the conduct that the foreign state performs or agrees to perform), see *De Sanchez, supra,* at 1393, the statute unmistakably commands that to be done, 28 U. S. C. § 1603(d). We agree with the Court of Appeals, see 941 F. 2d, at 151, that it is irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it matters only that it did so. We conclude that Argentina's issuance of the Bonods was a "commercial activity" under the FSIA.

### B

The remaining question is whether Argentina's unilateral rescheduling of the Bonods had a "direct effect" in the United States, 28 U. S. C. § 1605(a)(2). In addressing this issue, the Court of Appeals rejected the suggestion in the legislative history of the FSIA that an effect is not "direct" unless it is both "substantial" and "foreseeable." 941 F. 2d, at 152; contra, *America West Airlines, Inc.* v. *GPA Group, Ltd.*, 877 F. 2d 793, 798–800 (CA9 1989); *Zernicek* v. *Brown & Root, Inc.*, 826 F. 2d 415, 417–419 (CA5 1987), cert. denied, 484 U. S. 1043 (1988); *Maritime Int'l Nominees Establishment* v. *Republic of Guinea,* 224 U. S. App. D. C. 119, 135–136, 693 F. 2d 1094, 1110–1111 (1982), cert. denied, 464 U. S. 815 (1983); *Ohntrup* v. *Firearms Center Inc.*, 516 F. Supp. 1281, 1286 (ED Pa. 1981), aff'd, 760 F. 2d 259 (CA3 1985). That suggestion is found in the House Report, which states that conduct covered by the third clause of § 1605(a)(2) would be subject to the jurisdiction of American courts "consistent with principles set forth in section 18, Restatement of the

Law, Second, Foreign Relations Law of the United States (1965)." H. R. Rep. No. 94–1487, p. 19 (1976). Section 18 states that American laws are not given extraterritorial application except with respect to conduct that has, as a "direct and foreseeable result," a "substantial" effect within the United States. Since this obviously deals with jurisdiction to *legislate* rather than jurisdiction to *adjudicate,* this passage of the House Report has been charitably described as "a bit of a *non sequitur," Texas Trading & Milling Corp.* v. *Federal Republic of Nigeria,* 647 F. 2d 300, 311 (CA2 1981), cert. denied, 454 U. S. 1148 (1982). Of course the generally applicable principle *de minimis non curat lex* ensures that jurisdiction may not be predicated on purely trivial effects in the United States. But we reject the suggestion that § 1605(a)(2) contains any unexpressed requirement of "substantiality" or "foreseeability." As the Court of Appeals recognized, an effect is "direct" if it follows "as an immediate consequence of the defendant's . . . activity." 941 F. 2d, at 152.

The Court of Appeals concluded that the rescheduling of the maturity dates obviously had a "direct effect" on respondents. It further concluded that that effect was sufficiently "in the United States" for purposes of the FSIA, in part because "Congress would have wanted an American court to entertain this action" in order to preserve New York City's status as "a preeminent commercial center." *Id.,* at 153. The question, however, is not what Congress "would have wanted" but what Congress enacted in the FSIA. Although we are happy to endorse the Second Circuit's recognition of "New York's status as a world financial leader," the effect of Argentina's rescheduling in diminishing that status (assuming it is not too speculative to be considered an effect at all) is too remote and attenuated to satisfy the "direct effect" requirement of the FSIA. *Ibid.*

We nonetheless have little difficulty concluding that Argentina's unilateral rescheduling of the maturity dates on the

Bonods had a "direct effect" in the United States. Respondents had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments. Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a "direct effect" in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming. We reject Argentina's suggestion that the "direct effect" requirement cannot be satisfied where the plaintiffs are all foreign corporations with no other connections to the United States. We expressly stated in *Verlinden* that the FSIA permits "a foreign plaintiff to sue a foreign sovereign in the courts of the United States, provided the substantive requirements of the Act are satisfied," 461 U. S., at 489.

Finally, Argentina argues that a finding of jurisdiction in this case would violate the Due Process Clause of the Fifth Amendment, and that, in order to avoid this difficulty, we must construe the "direct effect" requirement as embodying the "minimum contacts" test of *International Shoe Co.* v. *Washington,* 326 U. S. 310, 316 (1945).[2] Assuming, without deciding, that a foreign state is a "person" for purposes of the Due Process Clause, cf. *South Carolina* v. *Katzenbach,* 383 U. S. 301, 323–324 (1966) (States of the Union are not "persons" for purposes of the Due Process Clause), we find that Argentina possessed "minimum contacts" that would satisfy the constitutional test. By issuing negotiable debt instruments denominated in United States dollars and payable in New York and by appointing a financial agent in that

---

[2] Argentina concedes that this issue "is before the Court only as an aid in interpreting the direct effect requirement of the Act" and that "[w]hether there is a constitutional basis for personal jurisdiction over [Argentina] is not before the Court as an independent question." Brief for Petitioners 36, n. 33.

city, Argentina "'purposefully avail[ed] itself of the privilege of conducting activities within the [United States].'" *Burger King Corp.* v. *Rudzewicz,* 471 U. S. 462, 475 (1985), quoting *Hanson* v. *Denckla,* 357 U. S. 235, 253 (1958).

\*       \*       \*

We conclude that Argentina's issuance of the Bonods was a "commercial activity" under the FSIA; that its rescheduling of the maturity dates on those instruments was taken in connection with that commercial activity and had a "direct effect" in the United States; and that the District Court therefore properly asserted jurisdiction, under the FSIA, over the breach-of-contract claim based on that rescheduling. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*