Solfred MAIZUS, Plaintiff,

v.

WELDOR TRUST REG., Guy Bermes, Impexco of Texas, Inc., Chief Everest N. Ofoegbu, Captain Davies, Alhadji M.A. Daura, Central Bank of Nigeria, John Doe and Mary Roe (the names intended for persons employed by the Central Bank of Nigeria whose names are unknown), Defendants.

No. 91 Civ. 1492 (JES).

United States District Court, S.D. New York.

April 22, 1993.

See also, 144 F.R.D. 34.

102

Bloom Borenstein, P.C., New York City, Jaffe & Schlesinger, P.A., Springfield, N.J. (Howard G. Schlesinger, of counsel), for Weldor defendants.

Chalos & Brown, P.C., New York City (Stephan Skoufalos, Matthew B. Wieliczko, of counsel), for defendant Cent. Bank of Nigeria.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge:

Defendant Central Bank of Nigeria ("CBN") moves to dismiss cross-claims asserted against it by Weldor Trust Reg. ("Weldor"), Guy Bermes ("Bermes") and Impexco of Texas, Inc. ("Impexco") (collectively the "Weldor defendants")[1] under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602–1611 (1988) ("FSIA"). For the reasons that follow, that motion is granted.

## BACKGROUND

This complaint arises out of an alleged fraudulent contract ("the contract") for the sale of Nigerian light crude oil by the Federal Government of Nigeria to defendants Weldor and Impexco. That purported contract was entered into between Bermes on behalf of the Weldor defendants and defendants Chief Everest N. Ofoegbu, Captain Davies, and Mr. Alhadji M.A. Daura (the "Nigerian defendants") on behalf of the Nigerian government on August 27, 1990. *See* Defendant CBN's Appendix, Exhibit 9 ("Def.App., Ex."). Pursuant to its terms, the Federal Republic of Nigeria agreed to sell to the Weldor de-

---

1. Impexco is an American corporation with its principal place of business in Texas. Bermes is a citizen of Luxembourg and a resident of both Luxembourg and Switzerland. At all relevant times, he was president of Impexco and the beneficial owner of Weldor, a Liechtenstein trust.

fendants 2.7 million barrels of the above-referenced Nigerian light crude. *See id.*

The contract further required that Weldor Trust and Impexco deposit $500,000 in an account under the name Weldor Trust Account at CBN to be transferred to an account of the Nigerian government five days after the departure from Nigerian territorial waters of Weldor's ship carrying the crude oil cargo. *See id.* In order to effectuate that deposit, the Nigerian defendants loaned the Weldor defendants the $500,000. *See id.,* Ex. 10. Later, on or about September 18, 1990, plaintiff Solfred Maizus, a 50% shareholder in Impexco, *see id.,* Ex. 1, wired to an account controlled by the Nigerian defendants an amount covering the $500,000 advance and a $30,000 fee as consideration for that advance. *See id.,* Ex. 10; Amended Complaint, ¶¶ 25, 26. Thereafter, each of the Weldor defendants guaranteed a promissory note payable to Solfred Maizus for his financing of the oil transaction secured, in part, by the $500,000 deposited into the Weldor Trust Account at CBN.

On September 11, 1990, Bermes and Chief Ofoegbu met with Mr. J.O. Daramola, an employee of CBN in their Banking Supervision Department, *see* Affidavit of Victor Atebioritsemiro Moore sworn to October 22, 1992 ("Moore Aff."), ¶ 21,[2] at his office for the purpose of opening an account at CBN. At that meeting, Bermes completed and signed a form to open the account and handed Daramola a briefcase containing $500,000 in cash with a letter purportedly from the Nigerian government authorizing Daramola to open an account in Weldor's name.[3] *See* Def.App., Ex. 13, 14. Daramola gave Bermes a handwritten temporary receipt on a Central Bank of Nigeria notepad. *See id.,* Ex. 16; Moore Aff., Ex. B. An allegedly official receipt headed "Central Bank of Nigeria," bearing a CBN seal, and allegedly signed by a CBN official, was faxed to Bermes two days later. *See* Def.App., Ex. 17–18; Moore Aff., Ex. C.

The delivery of crude, for reasons not especially clear,[4] was never completed, the money was never returned, and Maizus brought his action. The Weldor defendants filed cross-claims against the Nigerian defendants, Daramola and CBN under RICO, common law fraud and, in the alternative, negligent misrepresentation. CBN filed this motion to dismiss the cross-claims claiming immunity from suit as a foreign sovereign.[5] The Weldor defendants argue that the alleged acts of CBN qualify under the commercial activity exception to immunity under the FSIA for acts performed outside the United States which cause a direct effect in the United States, the only exception which

---

2. Moore's affidavit was not controverted by any evidence submitted by the Weldor defendants.

3. For the purposes of this motion, the Court assumes, *arguendo,* that Daramola had apparent authority to act for CBN, an assumption that is gratuitous at best given the particular circumstances of this case. For instance, it is uncontroverted that the principal job duties of members of the Banking Supervision Department, the branch of the Bank in which Daramola worked, were to review the viability of banks as financial concerns and assure their compliance with Nigeria's Banking Act, and did not include opening accounts. *See* Moore Aff., ¶¶ 22, 23. Furthermore, CBN did not accept deposits on behalf of private individuals or entities, *see id.,* ¶ 6, and only accepted deposits in Nigerian currency, naira. *See id.,* ¶¶ 12–13. Customarily, accounts were opened by cashiers at CBN's Banking Office and only during banking hours. *See id.,* ¶ 19. The instant transaction took place at the Savannah Bank Building, not at CBN's Banking Office, *see id.,* ¶ 19; Def.App., Ex. 11, and was completed between 3:00 p.m. and 4:00 p.m., well after the Bank had closed at 1:30 p.m. *See* Moore Aff., ¶ 19; Def.App., Ex. 11. Finally, for his involve-

ment, Daramola was suspended on or about November 8, 1990, and his employment was terminated on June 20, 1991. *See* Moore Aff., ¶ 25.

4. Plaintiff Maizus alleges that the ship arrived in Nigerian waters and waited for directions to enter the Port for loading which never came. The Nigerian defendants charge that the ship was blacklisted from lifting the cargo because it illegally entered Nigerian waters.

5. A motion to dismiss under the FSIA is equivalent to an attack on the Court's subject matter and personal jurisdiction in connection with which the Court may consider materials outside the pleadings. *See, e.g., Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986); *Weltover, Inc. v. Republic of Arg.,* 753 F.Supp. 1201, 1203 n. 2 (S.D.N.Y.), *aff'd,* 941 F.2d 145 (2d Cir.1991), *aff'd,* — U.S. —, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); *Am. Centennial Ins. Co. v. Seguros La Republica, S.A.,* No. 90 Civ. 2370, 1991 WL 60378, at *3, 1991 U.S.Dist. LEXIS 4546, at *8 (S.D.N.Y. Apr. 8, 1991).

plaintiffs allege to be applicable. *See* 28 U.S.C. § 1605(a)(2).[6]

## DISCUSSION

■ Under the FSIA, foreign states are immune from suit in United States courts subject to certain statutory exceptions. *See* 28 U.S.C. §§ 1605, 1607; *Verlinden B.V. v. Central Bank of Nig.*, 461 U.S. 480, 486–89, 103 S.Ct. 1962, 1967–69, 76 L.Ed.2d 81 (1983); *Carey v. Nat'l Oil Corp.*, 592 F.2d 673, 676 (2d Cir.1979) (per curiam). One of these, the commercial activity exception, removes that immunity where sovereigns engage in conduct which is commercial and private in nature, regardless of its purpose. *See* 28 U.S.C. § 1603(d); *Republic of Arg. v. Weltover, Inc.*, —— U.S. ——, ——–——, 112 S.Ct. 2160, 2166–67, 119 L.Ed.2d 394 (1992); *Texas Trading & Milling Corp. v. Fed. Republic of Nig.*, 647 F.2d 300, 308–10 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). In the instant case, the parties do not dispute that CBN· is a sovereign within the meaning of the FSIA, nor can any colorable claim be made that CBN's receipt of a bank deposit was not commercial activity within the meaning of section 1603(d) of the FSIA. However, for the reasons that follow, CBN's motion to dismiss must be granted because that activity had no direct effect in the United States.

6. That section provides:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) ...;

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.] 28 U.S.C. § 1605(a)(2).

7. Moreover, there is even less basis on which Weldor and Bermes, the two foreign Weldor defendants, may claim that the commercial activity at issue here caused a direct effect in the United States. Courts have found a direct effect to have occurred with respect to foreign domiciled plaintiffs only if some performance obligation or other

■ The only conceivable predicate for any claim that there has been any effect in the United States in this case consists solely of the fact that one of the Weldor defendants, Impexco, is an American corporation and, by virtue of that domicile, suffered an injury here. However, this Court is aware of no case in which that circumstance has been found to be a sufficient basis for jurisdiction under the FSIA.[7]

■ Indeed, courts have consistently held that the FSIA's enumerated exceptions to sovereign immunity "requir[e] some form of substantial contact with the United States[,]" *see Verlinden, supra,* 461 U.S. at 490–91, 103 S.Ct. at 1969–70; *Texas Trading, supra,* 647 F.2d at 311–12, in that some legally significant act giving rise to the claim occur in the United States. *See, e.g., Weltover, Inc. v. Republic of Arg.,* 941 F.2d 145, 152–53 (2d Cir.1991), *aff'd,* —— U.S. ——, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (citing *Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511, 1515 (D.C.Cir.1988)). For example, the requisite nexus with the United States has been found where foreign sovereigns have defaulted on performance obligations due in the United States.[8] *See, e.g., Republic of Arg. v. Weltover, Inc., supra,* —— U.S. at ——– ——, 112 S.Ct. at 2168–69; *see also Antares Aircraft v. Fed. Republic of Nig.,* 948 F.2d 90, 95 (2d Cir.1991), *vacated,* —— U.S. ——, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992).[9]

benefit was due in the United States. *See Republic of Arg. v. Weltover, Inc., supra,* —— U.S. ——, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); *Int'l Hous. Ltd. v. Rafidain Bank Iraq,* 893 F.2d 8 (2d Cir.1989).

8. In the instant case, the legally significant acts alleged, *i.e.,* fraud and negligent misrepresentation in connection with the deposit, occurred in Nigeria.

9. In *Antares,* the Second Circuit concluded that a financial loss suffered by an American plaintiff, without more, was an insufficient basis to find a direct effect in the United States, although, for reasons that are not readily apparent, the Supreme Court vacated that opinion based on *Republic of Arg. v. Weltover, Inc., supra,* —— U.S. ——, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). However, the Court is nonetheless persuaded that *Antares* reflects a ·correct interpretation of the FSIA. *See also Gregorian v. Izvestia,* .871 F.2d 1515, 1527 (9th Cir.), *cert. denied,* 493 U.S.

Moreover, even assuming, *arguendo*, that Impexco's U.S. domicile was a sufficient predicate for finding an effect in the United States with respect to its claims, the injury it alleges is under no rational construction of the term a direct injury. An effect is direct when "it follows as an immediate consequence of the defendant's . . . activity." *See Republic of Arg. v. Weltover, Inc., supra,* —— U.S. at ——, 112 S.Ct. at 2168 (citation omitted). Here, the $500,000 deposited in the Weldor Trust Account at CBN, which had been originally designated in the oil contract to be paid to the Nigerian defendants as compensation for the completed oil transaction and which, upon repayment by Maizus of the $500,000 advanced by the Nigerian defendants, became security for Maizus's note, was instead, since that transaction was never completed, payable to Maizus, on his demand in accordance with the terms of the promissory note. Therefore, the loss of the money from the Weldor Trust Account at CBN directly effected Maizus, if anyone, but clearly had no immediate consequence on any of the Weldor defendants, who are at best liable to compensate Maizus for the loss which he, not they, suffered.[10]

In any event, the exercise of jurisdiction over CBN in this case would not be consistent with due process and thus cannot be exercised under the FSIA. *See Int'l Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The Court of Appeals in *Texas Trading, supra,* articulated the standard for evaluating the sufficiency of a foreign state's contacts with the United States for constitutional purposes. That standard requires the Court to analyze the extent to which a defendant has availed itself of the privileges of American law, the extent to which litigation in the United States would be foreseeable to it, the inconvenience to that defendant of litigating in the United States, and the countervailing interest of the United States in hearing the suit. *See Texas Trading* at 314.

In the instant case, the Weldor defendants have presented no evidence that CBN engaged in any act purposefully availing itself of the privilege of conducting activities in the United States to an extent that it can be said to have invoked the benefits and protections of American laws,[11] *see, e.g., Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958), nor for that matter that CBN conducts continuous and systematic business in the United States such that the Court could properly assert general jurisdiction over it. *See, e.g., Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). Consequently, in the absence of such contacts, it could not have been foreseeable to CBN that it would be subject to the jurisdiction of an American court.

---

891, 110 S.Ct. 237, 107 L.Ed.2d 188 (1989); *Zedan v. Kingdom of Saudi Arabia, supra,* 849 F.2d 1511, 1515 (D.C.Cir.1988); *Martin v. Republic of S. Afr.,* 836 F.2d 91 (2d Cir.1987). This is especially true since the FSIA makes it abundantly clear that the exercise of jurisdiction under the FSIA must be consistent with constitutional standards of due process with respect to the exercise of long-arm jurisdiction. *See, e.g., World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). It is well-settled that due process standards of minimum contacts are not satisfied by the mere circumstance that a plaintiff has suffered an injury in the jurisdiction because he is domiciled there. *See id.*

10. Moreover, no serious argument can be made here that CBN is excepted from immunity because it acted with knowledge that its conduct in Nigeria would have consequences in the U.S. Even assuming, *arguendo,* that CBN had such knowledge, the Court of Appeals has rejected a claim that FSIA immunity was not available where a foreign sovereign breached its contract with an American corporation's wholly owned Bahamian subsidiary with full knowledge that its act would injure the American parent as well. *See Carey v. Nat'l Oil Corp., supra,* 592 F.2d 673 (2d Cir.1979).

11. In this Circuit, while foreign states bear the burden of proving that they are entitled to sovereign immunity under the FSIA, *see, e.g., L'Europeenne de Banque v. La Republica de Venezuela,* 700 F.Supp. 114, 119 (S.D.N.Y.1988), plaintiffs nevertheless have the burden of proving that a court has personal jurisdiction over defendants. *L'Europeenne de Banque,* 700 F.Supp. at 122; *see also Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120 (2d Cir.1984); *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981); *Tifa v. Republic of Ghana,* No. 88–1513, 1991 WL 179098, at *6–7, 1991 U.S.Dist. LEXIS 11855, at *23 (D.D.C. Aug. 27, 1991).

Similarly, there is no evidence that suit in the U.S. would not be burdensome to CBN, and its dearth of contacts with the U.S. in connection with this transaction mitigates against the assertion of jurisdiction over it. For this reason, and the further fact that two of the three Weldor defendants are foreigners, there is no overriding interest of the United States which would weigh in favor of exercising jurisdiction here. *See, e.g., Shaffer v. Heitner,* 433 U.S. 186, 213–16, 97 S.Ct. 2569, 2584–86, 53 L.Ed.2d 683 (1977); *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957). *See generally World–Wide Volkswagen, supra; Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).[12]

## CONCLUSION

For the reasons stated above, Central Bank of Nigeria's motion to dismiss shall be and hereby is granted.

It is **SO ORDERED**.

---

12. In their brief and at Oral Argument, the Weldor defendants stated their reliance on *Wyle v. Bank Melli of Tehran, Iran,* 577 F.Supp. 1148 (N.D.Cal.1983) for the premise that a financial loss to an American plaintiff was sufficient to constitute a direct effect in the United States. However, in *Wyle,* the court found that an obligation on a letter of credit, if enforced, would cause a withdrawal of assets from the United States. The instant case involves no such clearly direct effect in the U.S. Moreover, the *Wyle* court expressly recognized that financial loss to an American plaintiff is not in itself sufficient to premise jurisdiction where the constitutional requirement of minimum contacts is not satisfied. *See Wyle,* 577 F.Supp. at 1158; *Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica,* 614 F.2d 1247 (9th Cir.1980).