**RSM PRODUCTION CORPORATION, a Texas corporation, Plaintiff,**

v.

**PETROLEOS DE VENEZUELA SOCIETA ANONIMA (PDVSA), PDVSA Petroleo, S.A., and Citgo Petroleum Corp., Defendants.**

No. CIV.03–RB–0640(MJW).

United States District Court, D. Colorado.

Sept. 30, 2004.

Michelle Connaughton, Roger Jatko, Samuel Yahn, RSM Production Corporation, Greenwood Village, CO, Phillip D. Barber, Phillip D. Barber, P.C., Denver, CO, for RSM Production Corp.

Tom Mcnamara, Dale R. Harris, John Francis, Davis, Graham & Stubbs, LLP, Denver, CO, for Petroleos de Venezuela S.A.

Scott C. Solberg, Eimer, Stahl, Klevorn & Solberg, Chicago, IL, for CITGO Petroleum Corp.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

BLACKBURN, District Judge.

This matter is before me on the following motions: 1) Petroleos De Venezuela, S.A.'s (PDVSA) motion to dismiss [# 93], filed November 17, 2003; 2) PDVSA Petroleo, S.A.'s motion to dismiss [# 95], filed November 17, 2003; and 3) CITGO Petroleum Corporation's motion to dismiss the second amended complaint [# 60], filed October 2, 2003. The motions are fully briefed. For the reasons discussed below, the motions are granted.

The complaint at issue is the plaintiff's Third Amended Complaint (Complaint) [# 73], filed October 22, 2003. CITGO's motion to dismiss, filed October 2, 2003, is directed to the Second Amended Complaint [# 40], filed August 11, 2003. On November 17, 2003, shortly after filing its Third Amended Complaint, RSM filed a response to CITGO's motion to dismiss. RSM simply adopts the arguments it made in response to CITGO's first motion to dismiss [# 6], which was filed May 6, 2003. As to CITGO, the allegations in the Third Amended Complaint do not differ substantially from the previous complaints. The arguments asserted by CITGO in its October 2, 2003, motion to dismiss the Second Amended Complaint are equally applicable to the Third Amended Complaint, and it appears that the parties intend that this motion now be read as addressing the Third Amended Complaint. I will address CITGO's motion to dismiss in relation to the Third Amended Complaint.

## I. STANDARD OF REVIEW

■ Defendants PDVSA and PDVSA Petroleo argue that they are immune from the jurisdiction of the courts of the United States under the Foreign Sovereign Immunities Act (FSIA). 28 U.S.C. §§ 1602–1611. The FSIA is the exclusive source of jurisdiction for claims against foreign states or their instrumentalities in the courts of the United States. *Southway v. Central Bank of Nigeria,* 328 F.3d 1267, 1271 (10th Cir.2003). A foreign state is presumptively immune from jurisdiction under the FSIA, and remains so unless one of the specific statutory exceptions applies. 28 U.S.C. § 1605. The court's subject matter jurisdiction is dependent on the existence of an exception. *Id.* at 1271. "Once a foreign state makes a prima facie showing of immunity, the plaintiff seeking to litigate in the United States then has the burden of showing that an exception applies." *Gen. Elec. Capital Corp. v. Grossman,* 991 F.2d 1376, 1382 (8th Cir. 1993). If the plaintiff comes forward with evidence demonstrating that an exception is applicable, the defendant must meet its ultimate burden of proving that the exception does not apply. *Southway,* 328 F.3d at 1271.

Defendant CITGO moves for dismissal for failure to state a claim, under FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), I must determine whether the allegations set forth in the complaint, if true, are sufficient to state a claim within the meaning of FED. R. CIV. P. 8(a). "[T]he complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1533 (10th

Cir.1992). The complaint must be construed in the light most favorable to plaintiff, and its allegations must be taken as true. *Robinson v. City and County of Denver* 39 F.Supp.2d 1257, 1262–1263 (D.Colo.1999) (citing *Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1533 (10th Cir.1992)). However, the court need not assume that the plaintiff "can prove facts which he has not alleged or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen'l Contractors v. Calif. State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

## II. BACKGROUND

Plaintiff RSM Production Corporation is a Texas corporation involved in international oil and gas exploration and production. In July, 1996, the country of Grenada granted RSM an exclusive offshore license to explore, develop, produce, and market oil and/or natural gas in an area covering approximately 4.75 million acres. *Complaint,* ¶ 14. RSM alleges that the defendants have effectively blocked RSM's ability to explore, develop, and produce resources under RSM's license with Grenada.

Defendant PDVSA is the national, state-owned oil company of Venezuela. PDVSA is a wholly owned corporation of the Government of Venezuela. *Complaint,* ¶ 2. PDVSA refines crude oil in its refineries in the United States and elsewhere, and markets its refined products through its wholly owned U.S. marketing arm, defendant CITGO Petroleum Corporation. *Id.* Defendant PDVSA Petroleo, S.A. (Petroleo) "is a first line subsidiary of PDVSA once removed from governmental ownership." *Complaint,* ¶ 21. In the Complaint, RSM refers to these three defendants collectively as "PDVSA." *Complaint,* ¶ 13. I do not adopt this collective reference. Rather, I will refer to PDVSA, Petroleo, and CITGO individually.

RSM and Grenada have agreed to suspend the license agreement until Grenada's maritime boundaries with Venezuela and Trinidad are resolved. *Complaint,* ¶ 39. RSM says it has tried for six years "to get PDVSA to establish the boundary with RSM on the principle that it is beneficial for both RSM and for PDVSA to know precisely the territories" they are entitled to explore and develop. *Complaint,* ¶ 19. RSM says both it and PDVSA must recruit foreign investment partners to fund efforts to develop their oil and gas resources. RSM alleges that "without resolution of the boundaries, RSM is effectively barred from competing against PDVSA for foreign investment partners." *Complaint,* ¶ 24. I note that RSM sometimes uses the term "investment issues" to refer to the boundary issue described in the Complaint. "As a result of PDVSA's actions or failures to act, RSM is effectively barred from the acreage to which RSM has a legal claim." *Complaint,* ¶ 25. RSM notes that PDVSA has established boundaries with Petronin Trinidad concerning offshore areas of Trinidad using the "Geneva 1952 and 1958 Convention advocating a medium line between shores...." *Complaint,* ¶ 40. PDVSA has refused to us this "medium line" approach to resolve the boundary issue with RSM and Grenada. *Id.* RSM also alleges that PDVSA has asserted rights in the area that is subject to RSM's license from Grenada.

According to RSM, "PDVSA is thwarting RSM's investment by failing or otherwise refusing to resolve the investment issues by constantly refusing ... to resolve the investment issues ...." *Complaint,* ¶ 39. RSM alleges that PDVSA's conduct is calculated to "preserve its monopolistic regional standing as the only country in the region with which foreign investors must conduct trade." *Complaint,* ¶ 13. "This leaves RSM no choice

but either to seek the Court's assistance in establishing the boundaries and resolving the investment dispute, or (to) press for damages in court." *Complaint,* ¶ 31. RSM asserts six claims for relief: 1) intentional interference with contract and prospective business opportunities; 2) illegal exercise of monopoly power/monopoly leveraging, in violation of 15 U.S.C. § 2; 3) Violations of the Clayton Act; 4) constructive trust; 5) denial of access to essential facilities, in violation of 15 U.S.C. § 2; and 6) civil conspiracy. *Complaint,* pp. 20–26.

### III. FOREIGN SOVEREIGN IMMUNITY ACT

PDVSA and Petroleo argue that RSM's Complaint must be dismissed because they are immune from the jurisdiction of the federal courts under the Foreign Sovereign Immunities Act (FSIA or Act). 28 U.S.C. §§ 1602–1611. Under the FSIA, foreign states generally "shall be immune from the jurisdiction of the courts of the United States except as provided in sections 1605 to 1607" of the Act. 28 U.S.C. § 1604. The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).

The protections of the FSIA are extended to "foreign states," which include "an agency of instrumentality of a foreign state." 28 U.S.C. § 1603(a) & (b). RSM agrees that PDVSA is an agency or instrumentality of a foreign state. *RSM Response* [# 129], filed January 15, 2004, p. 18. A foreign state is "presumptively immune under the (FSIA) and remains so unless one of the specific statutory exceptions applies." *Southway v. Central Bank of Nigeria,* 328 F.3d 1267, 1271 (10th Cir. 2003).

RSM argues that an exception generally called the "direct effect" exception is appli-

cable to its claims against PDVSA. Under this exception, a foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case "in which the action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 18 U.S.C. § 1605(a)(2). RSM's claims are based on actions allegedly taken by PDVSA outside of the United States. PDVSA argues that its alleged actions do not constitute commercial activity, and that its alleged actions cannot be seen as having caused a direct effect in the United States.

Assuming the allegations in the Complaint to be true, I conclude that RSM has not alleged facts that would support a claim that PDVSA's alleged actions caused a direct effect in the United States. Absent such an effect, this court does not have jurisdiction over PDVSA. In light of this conclusion, I will not address the argument over whether PDVSA's alleged actions constitute commercial activity.

### A. Application of The Direct Effect Exception

In *Republic of Argentina v. Weltover,* 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992), the Court found that the plaintiffs claims against Argentina fell within the direct effect exception. The plaintiffs held bonds that called for Argentina to make payment of principal and interest at one of four places, including New York, at the election of the creditor. The plaintiff creditors specified New York as the place where payment was to be made. When Argentina failed to make payment, the plaintiffs sued for breach of contract in federal court. Addressing the direct effect exception of § 1604(a)(2), the plaintiffs argued that Argentina's refusal to make pay-

ment caused a direct effect in the U.S. because payment that was supposed to have been made in New York was not made.

The Court said that an effect is direct if it follows as an immediate consequence of the defendant's activity. *Id.* at 618–19, 112 S.Ct. 2160. The Court held that Argentina's failure to pay had a direct effect in the United States because "(m)oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* at 619, 112 S.Ct. 2160. The court rejected an argument than an effect is not direct unless it is both substantial and foreseeable. *Id.* at 617–18, 112 S.Ct. 2160.

Following *Weltover,* the United States Court of Appeals for the Tenth Circuit addressed the direct effect exception of § 1605(a)(2) in *United World Trade, Inc. v. Mangyshlakneft Oil Production Assoc.,* 33 F.3d 1232 (10th Cir.1994). United World Trade (UWT) had a contract with Mangyshlakneft Oil Production (MOP) to buy a certain amount of oil during January, February, and March, 1992. MOP had authority to produce and export oil on behalf of the Republic of Kazakhstan, and thus was treated as a foreign state. After delivery, UWT was to pay MOP 97% of the price paid by UWT's customer, ISAB. Payment in U.S. dollars was arranged via the London branch of a Sicilian bank selected by UWT under the terms of the contract. The Sicilian bank transferred funds to its New York branch to be converted into U.S. dollars. After the conversion, MOP's share of the proceeds was credited to MOP's account with a Paris bank, and UWT's share was transferred to its U.S. bank.

After a few successful shipments, MOP refused to supply additional oil to UWT. UWT filed suit in federal court, asserting claims for breach of contract, anticipatory repudiation of contract, fraud, and conse-

quential damages. *Id.* at 1236. The plaintiff argued that MOP's refusal to supply additional oil under the contract had a direct effect in the United States because no additional oil proceeds were transferred to the U.S. for conversion into U.S. dollars. UWT also cited its losses in providing a guarantee to its customer, ISAB, and the fact that it suffered financial loss in the U.S. because of MOP's actions.

The Tenth Circuit held that these facts do not establish a direct effect in the United States for the purpose of § 1605(a)(2). Most Important, MOP's performance of its contractual obligations had no connection with the United States. *Id.* at 1237. The oil was delivered to a Sicilian refinery, and UWT paid MOP for the oil at MOP's bank in Paris. In other words, Paris was specified as the place of performance for UWT's contractual obligation. *Id.* The fact that a U.S. Bank was involved in UWT's efforts to convert the funds into U.S. dollars did not constitute an " 'immediate consequence of the defendant's activity' under any common sense reading of that phrase." *Id.* at 1238 (quoting *Weltover,* 504 U.S. at 618, 112 S.Ct. 2160).

> The requirement that an effect be "direct" indicates that Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States Such is the case here. The banking transfers referred to by UWT were only tangentially related to the performance of the parties' contractual obligations—all of which were to take place outside of the United States.

*Id.* at 1238. To the extent UWT claimed lost profits, the court concluded that this consequence did not occur in the U.S.

> The immediate consequence of MOP's alleged breach of contract and fraud was that UWT did not receive funds from

ISAB at the San Paolo bank in London. Although the loss of these funds could be characterized as a "direct effect" of the defendants' act, we conclude that the direct effect cannot be characterized as occurring "in the United States." *Id.* at 1238—39.

### B. The Direct Effect Exception is Not Applicable to PDVSA's Actions

RSM argues that PDVSA's alleged actions have had a variety of direct effects in the United States. RSM says PDVSA's alleged actions have a "direct effect on RSM's ability to explore and develop the concession." *RSM's Response to PDVSA's motion to dismiss*, p. 28. RSM says PDVSA's actions have made RSM's project more expensive, have prevented "potential importation of oil to the United States," and have "diminished RSM's ability to obtain funding and partners" in the U.S. *Id.*, pp. 28–29.

None of these alleged effects is sufficiently direct to bring PDVSA within the direct effect exception of § 1605(a)(2). Assuming RSM's allegations to be true, the "immediate consequence of the defendant's activity" is that RSM cannot explore and develop the area it claims to be entitled to develop. This area is in the ocean off Grenada, not in the U.S. RSM does not suffer this alleged consequence of PDVSA's actions in the U.S.

If PDVSA has made RSM's project more expensive, and has diminished RSM's ability to obtain funding and partners in the U.S., such effects are indirect. These effects only occur because RSM's inability to develop its concession off the coast of Grenada triggers other events which lead to a reluctance to invest by potential U.S. investors and partners. These alleged effects in the U.S. are analogous to the effects argued by the plaintiff in *United World Trade*. Again, in *United World Trade*, the defendants' refusal to deliver oil in Europe caused the plaintiff not to receive funds at a London bank. Eventually these events caused the plaintiff not to receive funds in the U.S., but that was an indirect effect of the defendants' action. 33 F.3d at 1238.

Finally, if PDVSA's actions prevent the "potential importation of oil to the United States," that effect truly is indirect. The phrase "potential importation of oil" indicates that there are several intervening steps that must be accomplished before RSM would see actual importation of oil. In this case, those intervening steps include exploration and the drilling of one or more productive oil wells. The existence of these intervening steps makes this alleged effect truly indirect.

PDVSA is a foreign state under the Foreign Sovereign Immunities Act. Assuming the facts alleged in the Complaint to be true, PDVSA's alleged actions did not cause any direct effect in the U.S. PDVSA is immune from the jurisdiction of the courts of the United States under the FSIA.

### C. Application of the FSIA to Petroleo

RSM argues that Petroleo is not immune from suit under the FSIA because Petroleo does not fall within the definition of a "foreign state" under the FSIA. Petroleo is a wholly owned subsidiary of PDVSA. Petroleo is the exploration and operating company through which PDVSA conducts its operations. 28 U.S.C. § 1603(b) defines the term "agency or instrumentality of a foreign state" for the purpose of the FSIA.

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other

ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

It is undisputed that Petroleo satisfies the first and third criteria. Applying the second factor of subsection (b), Petroleo does not qualify as an entity whose majority ownership is held by a foreign state because Petroleo is owned by PDVSA, and not by the Venezuelan government. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 475–77, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) (entity whose ownership is separated by "one or more corporate tiers" from foreign state does not fall within majority ownership provision of 28 U.S.C. § 1603(b)(2)). RSM argues that Petroleo does not satisfy the alternative requirement of subsection (b)(2) because Petroleo is not an organ of the government of Venezuela.

■■ Several factors are relevant to an assessment of organ status under the FSIA. These factors include (1) the circumstances surrounding the entity's creation; (2) the purpose of its activities; (3) the degree of supervision by the government; (4) the level of government financial support; (5) the entity's employment policies, particularly regarding whether the foreign state requires the hiring of public employees and pays their salaries; (6) the entity's obligations and privileges under the foreign state's laws; and (7) the ownership structure of the entity. *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 209 (3rd Cir.2003). No one factor is determinative. *Id.*

Applying these factors to the record in this case, I conclude that Petroleo is an organ of the government of Venezuela. The evidence in support of the factual determinations made here is cited by Petroleo in its motion to dismiss and its reply. Petroleo was created under a resolution issued by the Venezuelan Ministry of Energy and Mines. *Petroleo's reply*, filed May 3, 2004, p. 4. PDVSA was created as an instrument of the Venezuelan state's oil policy, and Petroleo is simply the exploration and operating arm of PDVSA. *Id.*, pp. 4–5. Venezuelan law requires that oil and gas activities be undertaken for the public welfare and social interest. *Id.*, pp. 5–6. Petroleo must follow in detail the polices, guidelines, and direction of the Venezuelan government, making its activities public in nature. *Id.*, pp. 6–7. Petroleo generally is governed by public law in Venezuela. *Id.*, pp. 7–8. Petroleo's ownership structure demonstrates a very close tie to the Venezuelan government. Again, Petroleo is wholly owned by PDVSA, which is wholly owned by the Venezuelan government. *Id.*, p. 8. The record contains no significant information about Petroleo's employment policies. On balance, these factors weigh heavily in favor of organ status for Petroleo under § 1603(b)(2). RSM's evidence and arguments to the contrary to not substantially alter this balance. My analysis is substantially consistent with the analyses finding organ status for first tier subsidiary entities of national petroleum companies found in *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T RESPECT*, 89 F.3d 650 (9th Cir.1996), and *Kelly v. Syria Shell Petroleum Development B.V.*, 213 F.3d 841 (5th Cir.2000).

Petroleo is an agency or instrumentality of the government of Venezuela under § 1603(b). As such, it is "immune from the jurisdiction of the courts of the United States except as provided in sections 1605 to 1607" of the FSIA. 28 U.S.C. § 1604. Again, the only exception argued by RSM is the direct effect exception defined in § 1604(a)(2). As discussed above, the di-

rect effect exception is not applicable to the alleged actions of Petroleo's parent, PDVSA. The allegations in the Complaint do not distinguish the alleged actions of Petroleo from those of PDVSA. Therefore, the direct effect exception does not apply to Petroleo for the same reasons it does not apply to PDVSA. Petroleo is immune from the jurisdiction of the courts of the United States under the FSIA.

### IV.  CITGO

█ CITGO argues that the claims against it must be dismissed because the plaintiff has not alleged any wrongdoing by CTIGO. The complaint does not describe any actions allegedly undertaken by CITGO. The plaintiff's only allegation concerning CITGO is that CITGO is alleged to be the wholly owned U.S. marketing arm of PDVSA. In its response to CITGO's motion to dismiss, RSM argues that CITGO is part of PDVSA's integrated production, transportation, and distribution system. RSM claims CITGO's role as part of this network subjects it to liability under the Sherman Act for PDVSA's attempts to exert unfair market pressure on RSM. *Response* [# 8], filed May 23, 2003, p. 5. As to CITGO, however, the Complaint does not contain any allegations of fact that would, if true, subject CITGO to liability under the Sherman Act or on any other basis. The fact that CITGO is a wholly owned subsidiary of PDVSA, without more, does not subject CITGO to liability on any basis. CITGO's motion to dismiss is granted because the allegations in the Complaint do not state a claim on which relief can be granted against CITGO.

### ORDERS

**THEREFORE IT IS ORDERED** as follows:

1) That Petroleos De Venezuela, S.A.'s (PDVSA) motion to dismiss [# 93], filed November 17, 2003, is **GRANTED;**

2) That PDVSA Petroleo, S.A.'s motion to dismiss [# 95], filed November 17, 2003, is **GRANTED;**

3) That the Complaint is **DISMISSED WITH PREJUDICE** as to defendants Petroleos De Venezuela, S.A., and PDVSA Petroleo, S.A.;

4) That CITGO Petroleum Corporation's motion to dismiss the second amended complaint [# 60], filed October 2, 2003, is **GRANTED;** and

5) That the Third Amended Complaint and this action are **DISMISSED.**