IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-20322

_____

VOEST-ALPINE TRADING USA CORPORATION,

Plaintiff-Appellee,

versus

BANK OF CHINA; BANK OF CHINA NEW YORK BRANCH,

Defendants,

BANK OF CHINA,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____

June 12, 1998

Before POLITZ, Chief Judge, REAVLEY, and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The issue in this appeal is whether, having engaged in a commercial transaction with an American corporation, a foreign state's failure to remit funds to the corporation's designated bank account in the United States is sufficient to support jurisdiction over the foreign state under the commercial activity exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(2). The district court held that it is. We agree. Because a financial loss was incurred in the United

States by an American plaintiff as an immediate consequence of the foreign state's commercial activity abroad, the loss constituted a direct effect within the scope of the third clause of the commercial activity exception. We, therefore, affirm.

I

A

In June 1995, Voest-Alpine Trading USA Corporation ("Voest-Alpine"), a New York corporation with its principal place of business in Houston, Texas, agreed to sell 1,000 metric tons of styrene monomer to the Jiangyin Foreign Trade Corporation ("JFTC") for USD $1,000 per metric ton. The shipment was to be delivered to the Port of Zhangjiagang, China, by July 1995. As security for performance of JFTC's payment obligation, the Bank of China issued an irrevocable letter of credit.

The Bank of China is an instrumentality of the People's Republic of China. On July 6, 1995, the Bank of China's Jiangyin Sub-Branch issued the letter of credit in the amount of USD $1.2 million. The letter of credit referred to JFTC as the applicant and Voest-Alpine as the beneficiary. The letter provided that upon proper presentment of all documents and drafts to the Jiangyin Sub-Branch, the Bank of China would pay Voest-Alpine the appropriate amount. It did not designate a particular place of payment, though it did state that it was to be governed by the

2

Uniform Customs and Practice for Documentary Credits of the International Chamber of Commerce, Publication No. 500 ("UCP 500"). Its expiry date was August 10, 1995, and the United States was the place of expiry.

The Jiangyin Sub-Branch sent the letter of credit via telex to the Bank of China's New York Branch, requesting that the New York Branch "advise" Voest-Alpine of the letter's issuance. It did so, and on July 22, 1995, Voest-Alpine delivered 997.731 metric tons of styrene monomer to the Port of Zhangjiagang, China. Shortly after its arrival, the shipment was unloaded into a customs warehouse, whereupon it was seized by Chinese customs.[1] Voest-Alpine then provided its bank, the Texas Commerce Bank ("TCB") in Houston, Texas, with the necessary documents for presentment to the Bank of China. On August 3, 1995, TCB forwarded the documents by courier to the Jiangyin Sub-Branch, which received them on August 9.

The documents were accompanied by a cover letter requesting that the Bank of China notify TCB immediately of any discrepancies or confirm that the documents had been accepted for payment. The cover letter also stated that payment was to be sent by wire to Voest-Alpine's TCB bank account in Houston. On

---

[1]Apparently, JFTC had an obligation to pay a tariff of sorts to the People's Republic of China, even though JFTC is owned, at least beneficially, by the People's Republic of China.

August 11, the Bank of China telexed TCB, alleging that the documents contained several discrepancies and stating that it was contacting JFTC as to whether the discrepancies should be waived. The Bank of China did not, however, reject the documents at that time. TCB and Voest-Alpine vigorously maintained that the documents were conforming. Finally, on October 4, 1995, after several correspondences between TCB, Voest-Alpine, the Bank of China, and JFTC, the Bank of China telexed TCB that JFTC insisted on refusal of payment and that the documents would be returned.

B

On October 20, 1995, Voest-Alpine filed the instant action against the Bank of China in the United States District Court for the Southern District of Texas in Houston, seeking damages for breach of the letter of credit.[2] The Bank of China responded with a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), asserting lack of jurisdiction and improper venue. It argued to the district court that, as a "foreign state" under the FSIA, 28 U.S.C. § 1603, it is immune from suit in any federal or state court in the United States unless one of the enumerated

---

[2]Previously, on October 16, 1995, Voest-Alpine commenced an action against JFTC in the Superior People's Court of Jiangsu Province. Following a hearing, the Chinese court entered judgment in Voest-Alpine's favor for the full amount of the contract price. Voest-Alpine avows that it is not seeking double recovery in the instant action.

exceptions to the FSIA applies.  Because none of the exceptions apply, the Bank of China contended, the action should be dismissed.  Voest-Alpine countered that the "commercial activity" exception applied because its action was based upon commercial activity conducted by the Bank of China (or its agents) in the United States and upon commercial activity by the Bank of China outside the United States that caused a direct effect in the United States.

On June 30, 1997, the district court denied the Bank of China's motion, concluding that Voest-Alpine had alleged facts sufficient to demonstrate the applicability of the commercial activity exception.  Based on the pleadings, the court determined that the lawsuit was based upon an act outside the United States, in connection with the Bank of China's commercial activity outside the United States, that caused a direct effect in the United States.  Thus, the court held, the lawsuit fell within the scope of the third clause of the commercial activity exception and, as a result, judgment on the pleadings dismissing the case would be inappropriate.  The Bank of China appeals.[3]

---

[3]The Bank of China also appeals the district court's refusal to dismiss the case for lack of venue.  Because the district court's decision in this respect is not a final appealable order under 28 U.S.C. § 1291, see Louisiana Ice Cream Distrib., Inc. v. Carvel Corp. & Franchise Stores Realty Corp., 821 F.2d 1031, 1033 (5th Cir. 1987), we decline to consider it here.

The district court's conclusion as to whether the Bank of China enjoys sovereign immunity under the FSIA is a question of law for which the standard of review is *de novo*. See <u>Stena Rederi AB v. Comision de Contratos</u>, 923 F.2d 380, 386 (5th Cir. 1991). As a procedural matter, the case comes to us on appeal of the district court's refusal to dismiss the action on a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Judgment on the pleadings is appropriate only if material facts are not in dispute and questions of law are all that remain. See <u>Hebert Abstract Co. v. Touchstone Properties, Ltd.</u>, 914 F.2d 74, 76 (5th Cir. 1990). Here, the parties have not yet conducted discovery and, therefore, we must assume the truth of factual allegations in the complaint. See <u>Saudi Arabia v. Nelson</u>, 507 U.S. 349, 351 (1993); <u>compare</u> <u>Baker v. Putnal</u>, 75 F.3d 190, 197–98 (5th Cir. 1996) (if the district court bases its ruling on facts developed outside the pleadings, we review the ruling as an order granting summary judgment).[4] With these standards in mind, we turn to the merits.

---

[4]Voest-Alpine attached to its complaint the letter of credit and other documents allegedly embodying its agreement with the Bank of China, the terms of the agreement between the parties being a legal issue underlying the action. Because these documents thereby became part of Voest-Alpine's pleadings, the district court's consideration of the documents did not make this a summary judgment case.

III

A

"The FSIA sets forth 'the sole and exclusive standards to be used' to resolve all sovereign immunity issues raised in federal and state courts." Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 532 (5th Cir.) (quoting H.R. Rep. No. 1487, 94th Cong., 2d Sess. 12 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6610), cert. denied, 506 U.S. 956 (1992). Under the FSIA, foreign states and their agencies or instrumentalities are generally immune from suit in the courts of the United States. Stena Rederi, 923 F.2d at 386 (citing 28 U.S.C. § 1604). There are, however, exceptions to the rule. Our case today turns on the "commercial activity" exception. This exception abrogates sovereign immunity in any case based upon a foreign state's commercial activity that has a jurisdictional nexus with the United States. See 28 U.S.C. § 1605(a)(2).

The commercial activity exception is broken down into three clauses, each identifying an act that is sufficiently connected to the United States to satisfy the jurisdictional nexus requirement. Specifically, the exception provides jurisdiction over a foreign state in any case:

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the

7

foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). All three clauses require that the cause of action be "based upon" a certain act or activity of the foreign state, that is, the act or activity must form the basis of at least some element of the cause of action. See Nelson, 507 U.S. at 357. All three clauses further require some "commercial" aspect to the foreign state's actions. Because the FSIA provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," see 28 U.S.C. § 1603(d), the question is not whether the foreign state is acting with a profit motive instead of seeking to fulfill uniquely sovereign objectives, but "whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'" Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992) (quoting Black's Law Dictionary 270 (6th ed. 1990)).

Here, the parties do not dispute that the Bank of China is a foreign state engaged in commercial activity. Indeed, because all of the Bank of China's acts and activities relevant to this case are indisputably "commercial" in nature, the second clause

8

is inapplicable.[5]  This appeal thus focuses on whether Voest-Alpine's cause of action is based on (1) any of the Bank of China's actions in the United States or (2) any of the Bank of China's actions outside the United States that caused a direct effect in the United States.  The elements of Voest-Alpine's cause of action are:  (a) issuance of the letter of credit, (b) timely presentation of necessary documents, and (c) failure to pay on the letter of credit.[6]  There is no real question that the Bank of China issued the letter of credit and was presented[7] the necessary documents in China, and we shall assume without deciding that neither of these acts *directly* affected the United States.  The question, then, is whether the Bank of China's

---

[5]The second clause permits jurisdiction if the cause of action is based on any "act" in the United States, provided it occurs "in connection with" commercial activity outside the United States.  Because the first clause permits jurisdiction based on "commercial" acts in the United States, the second clause is generally understood to apply to noncommercial acts in the United States that relate to commercial acts abroad.  Cf. Nelson, 507 U.S. at 358 (noting differences between first and second clauses).

[6]The Bank of China argues that the third element of Voest-Alpine's cause of action is not the failure to pay, but failure to reject the documents within seven banking days.  The Bank of China may indeed be correct, but the result is the same either way.  See infra note 12 and accompanying text.

[7]Voest-Alpine argues that presentment occurred when it furnished conforming documents to TCB in Texas.  But as the Bank of China correctly notes, TCB was Voest-Alpine's agent and thus acting as the "presenting bank."  Presentment occurred when TCB presented the documents to the Jiangyin Sub-Branch in China.

9

failure to pay occurred in the United States (first clause) or caused a direct effect in the United States (third clause).

B

The district court found jurisdiction under the third clause of the commercial activity exception.[8] That is, the district court determined that this action was based upon an act outside the United States, in connection with the Bank of China's commercial activity outside the United States, that caused a direct effect in the United States. In arriving at this conclusion, the district court relied on Voest-Alpine's allegations that the Bank of China's refusal to pay under the letter of credit was an act performed in connection with its commercial issuance of a letter of credit, which directly resulted in Voest-Alpine's nonreceipt of funds into its bank account in Texas. The Bank of China contends that the district court erred in finding a direct effect in the United States because the United States was neither the "place of payment" nor

---

[8]The district court also concluded that Voest-Alpine had pled facts sufficient to establish jurisdiction under the first clause based on its allegations that the letter of credit had been issued "through" the Bank of China's New York Branch. In particular, Voest-Alpine alleges that the New York Branch served not only as an advising bank, but also "opened an internal file on the letter of credit" and made "numerous phone calls to [Voest-Alpine] regarding payment on the letter of credit." Because we find jurisdiction proper under the third clause, we do not reach the question whether these allegations support jurisdiction under the first clause.

the place of any other "legally significant act" as required, the Bank argues, by the Supreme Court in <u>Weltover</u>.

(1)

Whether any given commercial activity abroad has a direct effect in the United States is a question that generally admits of no easy, clear-cut answer. Indeed, at one time, we described the determination as "'an enterprise fraught with artifice.'" <u>Callejo v. Bancomer, S.A.</u>, 764 F.2d 1101, 1111 (5th Cir. 1985) (quoting <u>Texas Trading & Milling Corp. v. Federal Republic of Nigeria</u>, 647 F.2d 300, 312 (2d Cir. 1981), <u>cert. denied</u>, 454 U.S. 1148 (1982)). Since that time, however, the Supreme Court has added significant (though not extensive) guidance on this question. In <u>Weltover</u>, <u>supra</u>, the Court addressed what constitutes a "direct effect" and announced a fairly simple test: "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.'" 504 U.S. at 607 (citation omitted). At the same time, the Court expressly rejected other requirements, adopted by several of the courts of appeals, that the effect be either "foreseeable" or "substantial." <u>Id.</u> In short, an effect in the United States is sufficient to support jurisdiction under the commercial activity exception so long as it is "direct"--with no other modifying adjectives.

11

Consistent with <u>Weltover</u>, this court had earlier held that a financial loss incurred in the United States by an American plaintiff may constitute a direct effect that supports jurisdiction under the third clause of the commercial activity exception.  <u>See</u> <u>Callejo</u>, 764 F.2d at 1111-12; <u>accord</u> <u>Grass v. Credito Mexicano, S.A.</u>, 797 F.2d 220, 221 (5th Cir. 1986), <u>cert. denied</u>, 480 U.S. 934 (1987); <u>Gould v. Pechiney Ugine Kuhlmann</u>, 853 F.2d 445, 453 (6th Cir. 1988); <u>Texas Trading</u>, 647 F.2d at 312; <u>Harris Corp. v. National Iranian Radio & Television</u>, 691 F.2d 1344, 1351 (11th Cir. 1982) (demand for payment on letter of credit issued by American bank causes direct effect in the United States because it results in depletion of funds in the American bank); <u>see also</u> <u>Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines</u>, 965 F.2d 1375, 1387 (5th Cir. 1992) (finding a direct effect because a breach of contractual obligation to provide legal defense resulted in an expenditure of considerable funds by an American corporation defending itself in an action brought in Arkansas); <u>compare</u> <u>Stena Rederi</u>, 923 F.2d at 390 (third clause did not apply because the plaintiff was a Swedish corporation, and "any financial loss it ha[d] suffered affect[ed] Sweden, not the United States").  <u>Callejo</u> controls the outcome of this case.

(2)

The Bank of China, however, does not agree.  First, it strenuously argues that a finding of direct effects in the United States requires the foreign state to have engaged in some "legally significant act" in the United States.  Second, it contends that Callejo is distinguishable because the direct effects in that case were based on a continuous series of commercial transactions in the United States.  Thus, the Bank maintains, Callejo involved a far greater quantity of foreign activity in the United States than is present here and involved factual circumstances in which the place of payment was the United States, not the foreign state.  We address each aspect of this argument, beginning with the so-called legally significant acts requirement.

(a)

The Bank of China contends that its failure to pay on the letter of credit did not have a direct effect in the United States because it did not engage in any legally significant act in the United States.  A "legally significant act," as defined by courts adopting this requirement, is an act "giving rise" to the cause of action.  See, e.g., Adler v. Federal Republic of Nigeria, 107 F.3d 720, 727 (9th Cir. 1997).  In support of its position, the Bank of China cites decisions from a number of circuits that have indeed embraced this requirement in cases

13

brought under the third clause.  See, e.g., Adler, supra; United World Trade, Inc. v. Manqyshlakneft Oil Prod. Ass'n, 33 F.3d 1232 (10th Cir. 1994), cert. denied, 513 U.S. 1112 (1995); Antares Aircraft, L.P. v. Federal Republic of Nigeria, 999 F.2d 33 (2d Cir. 1993), cert. denied, 510 U.S. 1071 (1994); General Elec. Capital Corp. v. Grossman, 991 F.2d 1376 (8th Cir. 1993).  The Fifth Circuit, however, has not adopted this requirement and, we think, for good reasons.

First and foremost, nothing in the text of the third clause supports such a requirement.  It simply requires (1) an act outside the United States (2) in connection with commercial activity outside the United States (3) that causes a direct effect in the United States.  See 28 U.S.C. § 1605(a)(2).  Under the third clause, then, the only act that must be legally significant--that is, give rise to or form the basis of the cause of action--is the act *outside* the United States.  In Weltover, the Supreme Court expressly admonished the circuit courts not to add "any unexpressed requirement[s]" to the third clause and specifically rejected the argument that direct effects must be substantial or foreseeable.  See 504 U.S. at 618.  The legally significant act requirement is unexpressed in the third clause and, thus, has been renounced by Weltover.

14

Courts still refusing to discard the legally significant acts requirement have done so because Weltover ultimately found a direct effect in the fact that the foreign state in that case had, under its contract, breached its obligation to pay (*i.e.*, to perform) in the United States. See, e.g., Antares, 999 F.2d at 36 ("Although the Court did not expressly adopt our 'legally significant acts' test, it used a similar analysis.").[9] But Weltover's reliance on a legally significant act in the United States does not justify, much less compel, the conclusion that it is or should be some kind of threshold requirement under the third clause. See Goodman Holdings v. Rafidain Bank, 26 F.3d 1143, 1147 (D.C. Cir. 1994) (Wald, J., concurring). A legally significant act in the United States will certainly cause a direct effect in the United States, but that does not mean that a direct effect in the United States can be caused *only* by a legally significant act in the United States. As the Court stated in Weltover, "an effect is 'direct' if it follows 'as an

_____

[9]It is worth noting that a recent Second Circuit case appears to have jettisoned the legally significant act requirement. See Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238 (2d Cir. 1994). In Commercial Bank, the court found jurisdiction under the third clause based on the fact that the foreign state was contractually bound to remit funds to New York banks, even though the foreign state's failure to do so was not the basis of the cause of action (and thus not a legally significant act), but merely an immediate consequence (or direct effect) of the foreign state's commercial activity outside the United States. See id. at 241.

15

immediate consequence of the defendant's . . . activity,'" and it need not be "foreseeable" nor "substantial."  504 U.S. at 618 (citation omitted).[10]

Second, requiring the effect to have a causal nexus with some legally significant act in the United States merges the third clause into the second clause of the commercial activity exception.  The second clause requires that the cause of action be based upon (1) an act in the United States (2) in connection with commercial activity outside the United States.  See 28 U.S.C. § 1605(a)(2).  Thus, under the second clause, the act *in the United States* must give rise to the cause of action or, in other words, be a "legally significant act" as the term is used by courts adopting such a requirement.  But if the third clause is read to require a legally significant act in the United States, it becomes indistinguishable from the second clause

---

[10]In <u>Weltover</u>, the argument was made that the foreign state's failure to pay bonds in New York City threatened the city's status as a "preeminent commercial center" and was thus a direct effect in the United States.  Rejecting the argument, the Court suggested that an effect may be "too remote or attenuated" to support jurisdiction under the third clause.  <u>Weltover</u>, 504 U.S. at 618.  Understood in context, this conclusion does not imply that the effect must be based on a legally significant act in the United States.  Rather, it means that the third clause does not permit jurisdiction over foreign states whose acts cause only speculative, generalized, immeasurable, and ultimately unverifiable effects in the United States.  See <u>id.</u> ("Of course the generally applicable principle *de minimis non curat lex* ensures that jurisdiction may not be predicated on purely trivial effects in the United States.")

16

except, perhaps, that the third clause would also require proof of an act outside the United States upon which the action is also based and which caused a direct effect in the United States. Of course, this interpretation of the third clause leaves it with no perceivable purpose, as plaintiffs would always opt to seek jurisdiction under the "lesser included" second clause. We are confident Congress did not intend such a meaningless construction of the commercial activity exception and, therefore, decline to adopt the legally significant act requirement under the third clause.

(b)

We also reject the Bank of China's contention that <u>Callejo</u> is distinguishable on its facts. In <u>Callejo</u>, the plaintiffs, citizens of the United States, purchased certificates of deposit from the defendant, a nationalized bank of Mexico. To make deposits with the defendant, the plaintiffs would instruct their bank in Texas to wire funds through another Texas bank to their account with the defendant. Interest on the certificates of deposit was typically paid to the plaintiffs by virtue of the same process of interbank transfers. Such transfers occurred over the course of 2-3 years, when the Mexican government froze interest payments at an amount below the market rate. The plaintiffs sued for breach of contract. Rejecting the

17

defendant's claim of sovereign immunity under the FSIA, this court found jurisdiction under the third clause of the commercial activity exception.  See 764 F.2d at 1110-12.

Contrary to the Bank of China's contentions, our holding in Callejo did not turn on whether the place of payment was in the United States.  Indeed, the Callejo court refused to attach any significance whatsoever to where the certificate of deposits were payable as a technical legal matter.  See id. at 1112 ("we do not perceive any material difference whether the legal place of payment was Mexico or the United States").  The third clause of the commercial activity exception, the court reasoned, was designed to avoid the kind of problems such questions created:

> [A]rcane doctrines regarding the place of payment are largely irrelevant. . . .  "Congress did not intend to incorporate into modern law every ancient sophistry concerning 'where' an act or omission occurs.  Conduct crucial to modern commerce--telephone calls, telexes, electronic transfers of intangible debits and credits-- can take place in several jurisdictions.  Outmoded rules placing such activity 'in' one jurisdiction or another are not helpful here."

Id. (quoting Texas Trading, 647 F.2d at 311 n.30).  Instead of focusing on where payment occurred in the wire transfers of money, the court turned its analysis to the effects of the defendant's activity and whether those effects were felt in the United States.  See id. at 1111-12.

18

Nor does the viability of our holding in Callejo depend on the continuous nature of the foreign state's activity in the United States in that case.  Callejo held that because the plaintiffs, and the bank account into which interest payments were to be made, were located in the United States,[11] "the effects of [the defendant's] breach were inevitably felt by them there."  Id.  The court's finding in this respect did not turn on the substantiality of those effects.  The court did go on to point out (consistent with then-current doctrine) that the defendant's activity in the United States was also continuous and thereby made effects in the United States "foreseeable."  See 764 F.2d at 1112.  However, as we recognized in Walter Fuller Aircraft, the Supreme Court's rejection of the substantiality and foreseeability requirements in Weltover simply lowered the standard for finding jurisdiction under the third clause.  See 965 F.2d at 1387.  Thus, Callejo's consideration of these factors was, in the light of Weltover, unnecessary once the court found direct effects in the United States.  Again:  a nontrivial effect in the United States need only be an immediate consequence of the

_____

[11]Callejo did not hold that any financial loss suffered by an American plaintiff, regardless of where that loss was incurred, is alone sufficient to constitute a direct effect under the third clause, cf. Texas Trading, 647 F.2d at 312 & n.35 (discussing cases), and we make no attempt to answer that question here.

19

foreign state's activity to support jurisdiction under the third clause.

C

Applying <u>Callejo</u> to the instant case, we are persuaded that the pleadings demonstrate facts sufficient to support the district court's jurisdiction over the Bank of China under the third clause of the commercial activity exception. Voest-Alpine is an American corporation that suffered a nontrivial financial loss in the United States in the form of funds not remitted to its account at a Texas bank. Voest-Alpine expressly instructed the Bank of China to wire payment on the letter of credit directly into Voest-Alpine's bank account in Houston, if the necessary documents were conforming. As the Bank of China conceded at oral argument, when the necessary documents are conforming, it is the Bank's customary practice to send payments on a letter of credit to wherever the presenting party specifies. In other words, had the Bank of China not found it necessary to refuse payment, it would have wired the money directly to Voest-Alpine's Texas bank account. Clearly, then, the Bank of China's failure to pay on the letter of credit caused a direct effect in the United States, that is, Voest-Alpine's nonreceipt of funds in

its Texas bank account followed as an "immediate consequence" of the Bank of China's actions.[12]

The Bank of China failed to prove otherwise. Although Voest-Alpine bore the initial burden of alleging facts which demonstrated that the commercial activity exception applied (*i.e.*, it bore a burden of production), the Bank of China bore the ultimate burden of persuasion on the question of immunity. See Arriba, 962 F.2d at 533.[13] It failed to meet this burden. As the district court concluded:

> [T]he pleadings indicate that the relevant funds are to be transferred directly from the [Bank of China] to the United States. Bank of China provides no evidence of any account outside the United States into which [Voest-Alpine] was to receive money under the letter of credit. [The Bank of China's] refusal to forward funds under the letter of credit clearly has a direct effect in the United States -- [Voest-Alpine] does not recover payment under the letter of credit for goods it shipped from the United States to China.

---

[12]The same conclusion obtains even if the relevant conduct is the Bank of China's failure to reject the documents within seven banking days inasmuch as an immediate consequence of this failure was Voest-Alpine's entitlement to receive payment under the letter of credit, a payment which the Bank of China failed to make.

[13]In cases where the parties dispute key facts, "discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." Id. at 534. Since the material facts were not in dispute here (the letter of credit and other documents representing the scope of the agreement between the parties were attached to the complaint), the district court did not order discovery.

The pleadings support jurisdiction under the third clause of the commercial activity exception and, therefore, the district court's refusal to dismiss Voest-Alpine's action for lack of jurisdiction was not error.[14]

                                    IV

In sum, we hold that a financial loss incurred in the United States by an American plaintiff, if it is an immediate consequence of the defendant's activity, constitutes a direct effect sufficient to support jurisdiction under the third clause of the commercial activity exception to the FSIA.  Here, Voest-Alpine, an American corporation, incurred a nontrivial financial loss in the United States as a direct result of the Bank of China's failure to pay on a letter of credit it issued.  This loss is sufficient to support jurisdiction under the third clause.  Accordingly, the judgment of the district court is

                                                A F F I R M E D.




REAVLEY, Circuit Judge, concurring:

_____

[14]Because we find jurisdiction proper under the third clause, we do not reach Voest-Alpine's argument (with which the district court agreed) that jurisdiction also existed under the first clause of the commercial activity exception based on its allegations that Texas was the place of payment.

I must accept this decision as consistent with the precedent of this circuit. The panel in *Callejo* plainly said that "the question of whether there was a direct effect in the United States can be resolved without reference to the place of payment. Since the Callejos were located in the United States, the effects of Bancomer's breach were inevitably felt by those there."[15]

The Supreme Court's opinion in *Weltover* does not overrule our precedent. The plaintiffs were not American companies and the Court repeated the statement that "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's ... activity.'"[16]

My own reading of the statute would be that a consequential loss, the result and not an element of the claim itself, is less than "direct." If the mere financial loss resulting from the breach or tort satisfies the statute, an American plaintiff need prove only commercial activity. Perhaps that was the intent of Congress, but I agree with the other circuits. As the Tenth Circuit said in *United World Trade, Inc. v. Mangyshlakneft Oil Production Association*:

> Nor is the fact that UWT is an American
> corporation that suffered a financial loss
> sufficient to place the direct effect of the

---

[15]   764 F.2d at 1111-12.

[16]   504 U.S. at 618.

23

> defendant's actions "in the United States."
> Appellant would have us interpret §
> 1605(a)(2) in a manner that would give the
> district courts jurisdiction over virtually
> any suit arising out of an overseas
> transaction in which an American citizen
> claims to have suffered a loss from the acts
> of a foreign state.  We think that the
> language of § 1605(a)(2) limiting
> jurisdiction to cases where there is a
> "direct effect" in the United States makes it
> unlikely that this was Congress' intent.[17]

Other circuits are in accord with the Tenth.  In *Antares Aircraft v. Federal Republic of Nigeria,* the Second Circuit found that although a contractual provision designating the United States as the place of performance may be sufficient to create jurisdiction, Nigeria's wrongful detention in Nigeria of an American corporate plaintiff's plane and demand for the plaintiff to make payments to various accounts, including a bank account in California, is insufficient for the "direct effect" exception.[18] The *Antares* court was looking for a legally significant act in the United States in order to grant jurisdiction.  Similarly, in *Goodman Holdings v. Rafidan Bank*, the D.C. Circuit Court determined that the foreign bank's failure to honor a letter of credit was not a "direct effect" because no United States

---

[17]33 F.3d 1232, 1239.

[18]999 F.2d 33 (2d Cir. 1993).

location was designated as the place of performance.[19]  That court based its conclusion, in part, on the fact that payment in the United States was not a contractual requirement, but merely at the request of the beneficiary to the letter of credit. Further, Judge Wald's concurrence only pointed out that the involvement of the New York bank might as well have been by customary practice, whether or not the contract specified payment there.

_____

[19]26 F.3d 1143, 1147 (D.C. Cir. 1994).