United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 1, 2006**

Charles R. Fulbruge III
Clerk

No. 05-20007
-1-

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 05-20007
_____

CAN-AM INTERNATIONAL, LLC,

Plaintiff - Appellant,

v.

THE REPUBLIC OF TRINIDAD AND TOBAGO;
THE TOBAGO HOUSE OF ASSEMBLY,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Texas, Houston Division

_____

Before GARWOOD, CLEMENT, AND PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:*

Can-Am International, L.L.C. ("Can-Am") appeals the district court's entry of final judgment dismissing its action for lack of subject matter jurisdiction. The district court found that no exception to sovereign immunity applies under the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. § 1602 et seq., to support jurisdiction over Appellees.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**I**

Appellant Can-Am International, L.L.C. is registered in Texas. Laura Lee Sorsby is its founder and CEO. Appellees are the Republic of Trinidad and Tobago and one of its political bodies, the Tobago House Assembly.

The Republic of Trinidad and Tobago ("T&T") comprises two islands in the Caribbean Sea near Venezuela. After achieving independence from Great Britain in 1962, the T&T central government established the Tobago House of Assembly ("THA") to administer Tobago Island. The THA consists of an Executive Council, which comprises several Secretaries, including the Chief Secretary. The responsibilities of the Office of Chief Secretary include planning Tobago Island development projects. At all relevant times in this case, the House Chief Administrator or Chief Secretary was either Allan Richards or Hochoy Charles.[1]

In 1997, Sorsby marketed her services as a financial consultant to T&T and the THA. After learning that the THA needed financing for various development projects, Sorsby incorporated Can-Am International, L.L.C. ("Can-Am") in Texas in 1998 and began submitting finance proposals to the THA.

Can-Am asserts that it sought funding proposals for

---

[1] The titles of these individuals and the dates in which they held these titles are not clear from the parties' briefs, but (like the district court noted in its order) these details do not affect the court's disposition.

conventional financing to be backed by a government guarantee in early 1998.  Later, in November 1998, it sought funding proposals for conventional financing to be collateralized by THA assets. On February 5, 1999, Sorsby sent a letter to Richards outlining a financing program Sorsby had arranged through a large United States insurance company.  In that letter she wrote:

> We are willing to come back to Tobago and work with you in order to try and put this whole thing together.  But before we come, we would appreciate it if you could appoint our company as your consultant/agent.  This does not commit the Government to anything.  You do not have to pay us anything if the loan does not go though [sic].  If you decide you do not wish to take the loan and participate in the trading program, then the appointment becomes null and void.

On February 22, 1999, the THA appointed Sorsby, CEO of Can-Am International, L.L.C., as the financial consultant for three of its development projects.  Paragraphs 5 and 6 of the appointment letter read:

> 5. This agency will be revoked in writing if Ms. Sorsby has failed to perform.
>
> 6. This agency agreement will remain in effect for six months, with an option of renewal, subject to the Tobago House of Assembly's satisfaction with Ms. Laura-Lee [sic] Sorsby's performance and the continuance of its engagement with ongoing financing arranged by Can-Am International L.L.C.

Charles allocated THA office space to Sorsby along with this appointment.

On March 27, 1999, the parties formalized their relationship by outlining their respective responsibilities in a Memorandum of

Understanding ("MOU").[2]  Sorsby's responsibilities included: introducing different financing structures to the THA for government review and selection; arranging the funding institution subject to THA approval; providing contractual arrangements with program managers of trading groups acceptable to the THA; negotiating interest rates, if required, payable on the funds held in T&T's account, subject to the approval of the THA; arranging for the profits generated by the financing program to go into a THA trust account; working with the THA to arrange collateral, if required, for the financing program selected by the THA; and investigating and arranging the lowest interest rates, if required, for the THA's selection and approval.

The THA's responsibilities under the MOU included: providing the most feasible and high priority projects for financing; getting all the necessary government approvals to implement the financing program selected by the THA from those submitted by Sorsby; executing all documents necessary to implement the selected financing program; and arranging all necessary government collateral as required.

The MOU states in paragraph 1.1, "All matters that require financial commitments by the THA shall be brought to the notice

---

[2] As noted by the district court, the MOU states that it is between the THA and Sorsby, rather than the THA and the plaintiff Can-Am.  The district court did not decide "whether the party designation was part of an on-going misrepresentation or merely a drafting error."

of the THA for agreement before any final commitments are made."

The MOU's fee clauses provide that:

THA agrees to pay the Financial Consultant a fee equal to ten percent (10%) of all monies earned from the private placement (or other funding programs) out of funds provided to THA generated by the funding program arranged by the Financial Consultant. . . .

In the event that THA selects a form of conventional financing from the financing structures submitted by the Financial Consultant, the parties shall negotiate . . . a fee agreeable to both parties to compensate the Financial Consultant for the services in arranging such financing.

As to duration, the MOU states:

1.4  The agency appointment will remain in effect from the time trading begins or as long as THA is receiving funds through any trading programs of financial arrangements provided by the Financial Consultant . . . .

1.5  This agency appointment can only be revoked in writing if the Financial Consultant fails to perform on the terms of this MOU.

Furthermore, the MOU has a choice of law provision: "This MOU and all amendments thereto shall be governed and constructed in accordance with the laws of the Republic of Trinidad and Tobago."

The THA did not pursue the financing program outlined in Sorsby's February 5th letter.  In early April 1999 Sorsby arranged for the THA officials to travel to London, England, for a series of meetings where various individuals presented investment opportunities for the THA's consideration.[3]  One

---

[3] Although Appellees originally sought conventional financing proposals, it considered financing through investment.

proposal came from a London firm called the Bower Cotton Group, for which payment was guaranteed by a bank in Switzerland. The proposal required Appellees to invest ten million United States dollars. Three days afterwards,[4] Sorsby wrote the THA's Chief secretary:

> We have wonderful and timely news for the THA. Bower Cotton . . . [has] available at the present time US$100 million dollars of good clean funds. They have an investor they are placing into the program. Because of the investor's contract with Bower Cotton . . . we are on a short time fuse [sic].

After requesting a letter of intent, proof of funds, and pay orders, Sorsby wrote, "We must have these things in order to get your contract issued from the bank for your review and approval." Regarding the pay orders, she wrote, "Remember our pay orders are generated through the trade, so if you do not go forward with the contract, these pay orders will be worthless."

Thus, upon returning to Tobago, the House Chief Secretary executed various documents related to the Bower Cotton proposal including a letter of intent, an "Irrevocable Pay Order" ("pay order"), and a letter of exclusivity. These documents explicitly reference a code specifically designated for the Bower Cotton proposal and are signed by the THA Chief Secretary Charles. The documents are dated April 19, 1999, but were signed on April 30, 1999.

---

[4] The letter erroneously bears the date March 12, 1999. It should have been dated April 12, 1999.

The letter of intent is addressed to Peter Newton,[5] the program manager for the potential investment, and states, "I herewith grant you the exclusive right to provide me with the best available investment program to facilitate the private placement of these funds."  The letter provides that the THA Chief Secretary is "willing and able to enter $ Ten Million US [sic] dollars for participation into a private bank-secured investment programme, subject to my [the Chief Secretary's] approval of the contract."

The pay order provides that Sorsby, in her individual capacity, will receive "[a] total of 10% (Ten Percent) of the net disbursable profits received by [the THA] or any Company on their behalf to facilitate the investment transaction . . . ."  The pay order names Sorsby as the beneficiary.  It also states, "The Irrevocable Pay Order is valid upon commencement of the start of the transaction herein . . . ."  The pay order also includes a waiver of immunity rights, and it submits the transaction to governance under the International Chamber of Commerce Rules of Conciliation and Arbitration.

The letter of exclusivity is also addressed to Newton and states in relevant part: "I [Charles], the undersigned, herewith grant the trade program manager/administrator/facilitator full

---

[5] Appellees identify Newton as an affiliate of Nikea, N.V. ("Nikea"), an engineering company that Sorsby alleges would have helped to construct the THA's projects.

exclusive right as our sole agent for 20 banking days from the above date [April 19, 1999], to enter these funds for me, or the corporation into the best available bank-secured investment program."

Despite Sorsby's recommendation to accept the Bower Cotton proposal and a letter from her stating that there was a short window of time to decide, the THA did not fund the Bower Cotton proposal. On July 11, 1999, Sorsby wrote an email to Rennie Dumas, a staff member at the THA, and stated, ". . . I cannot afford to keep giving away my services . . . . [T]he letter [Charles] prepared and the payorder [sic] meant nothing since [the THA] did not go forward." Sorsby continued to submit investment proposals to the THA, which rejected them all. On March 7, 2000, Sorsby wrote a letter addressed to Charles expressing her frustration with the THA: "I have always tried to get you what you need, lawyers, funding etc. [sic], and have not ever charged you a dime." Thereafter, some THA officials met with some financiers introduced by Sorsby, but did not enter into any agreement with them. The THA never obtained or received any money from any financing source introduced by Sorsby or Can-Am.

## II

In November 2001, Can-Am filed a complaint against T&T and the THA in the District Court for the Southern District of Texas. It later filed an amended complaint to include a claim for

quantum meruit.  T&T and the THA filed a motion to dismiss, or alternatively, a motion for summary judgment based primarily on the Foreign Sovereign Immunity Act (FSIA).  The district court denied the motion because it needed discovery to decide the issue of whether the FSIA applied to Appellees.

After discovery, in April 2004, T&T and the THA filed a motion for summary judgment claiming the court did not have jurisdiction over Can-Am's claims pursuant to the FSIA. Alternatively, they argued for summary judgment because no genuine issue existed as to any material fact, and that both T&T and the THA were entitled to judgment as a matter of law for all claims.

On September 8, 2005, the district court judge dismissed Can-Am's claim for lack of subject matter jurisdiction. It concluded that the FSIA precluded the court from reaching the merits of the case, reasoning that "there is no basis to overcome [Appellees'] presumption of immunity."  The district court denied Can-Am's motion for reconsideration on November 23, 2004.

**III**

Can-Am appeals the district court's entry of final judgment dismissing its action for lack of subject matter jurisdiction after having found no exception to sovereign immunity applies to

Appellees.  Can-Am argues that Appellees are subject to jurisdiction under two exceptions to its sovereign immunity under the FSIA, the waiver exception and the commercial activity exception.

The existence of subject matter jurisdiction under the FSIA is a question of law which is reviewed de novo.  Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana S.C., 923 F.2d 380, 386 (5th Cir. 1991).  The FSIA provides a framework for determining whether a court within the United States may exercise jurisdiction over a foreign state. The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in a court in the United States.  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).  Under the FSIA, a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless one of the several statutorily defined exceptions applies.  28 U.S.C. § 1604; see Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 488-89 (1983)("When one of [the] specified exceptions applies, 'the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances.'")(citing 28 U.S.C. § 1606).  The exceptions are enumerated in 28 U.S.C. § 1605.

Courts must apply the FSIA "in every action against a

foreign sovereign, since subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity." Verlinden, 461 U.S. at 493. The party claiming FSIA immunity must establish a prima facie case that it satisfies FSIA's definition of a foreign state, thereby creating a presumption of immunity. United States v. Moats, 961 F.2d 1198, 1205 (5th Cir. 1992); see also Keller v. Cent. Bank of Nigeria, 277 F.3d 811, 815 (6th Cir. 2002); Export Group v. Reef Indus., Inc., 54 F.3d 1466, 1470 (9th Cir. 1995). Then, the burden of production shifts to the non-movant to provide facts showing that an exception applies. Moats, 961 F.2d at 1205. To overcome a presumption of immunity, Can-Am must prove that the conduct that forms the basis of its complaint falls within one of the statutorily defined exceptions. Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 610-11 (1992); see 28 U.S.C. 1605 (exceptions to the jurisdictional immunity of a foreign state). Because it is undisputed that T&T is a foreign state and that the THA is T&T's instrumentality as defined in 28 U.S.C. § 1603, under the FSIA, they enjoy a presumption of immunity. Accordingly, the issue of subject matter jurisdiction turns on whether Can-Am rebuts the presumption of immunity enjoyed by T&T and the THA.

Two FSIA immunity exception provisions are at issue. The first is section 1605(a)(1), which discusses waiver. The second

is section 1605(a)(2), which discusses commercial activity. It
is Can-Am's burden to show that Appellees waived their immunity,
or that Appellees' conduct that forms the basis of Can-Am's
complaint is commercial activity as defined by the FSIA. A
failure to satisfy the statute's exceptions deprives a federal
court of subject matter jurisdiction. Stena, 923 F.2d at 386.

A. Whether T&T or the THA waived their immunity

Neither T&T nor the THA waived sovereign immunity with
respect to the conduct upon which Can-Am's complaint stands,
because the document containing the waiver clause was
conditional, and the condition never occurred.

Subsection (a)(1) states:

(a) A foreign state shall not be immune from the
jurisdiction of the courts of the United States or of the
States in any case (1) in which the foreign state has waived
its immunity either explicitly or by implication,
notwithstanding any withdrawal of the waiver which the
foreign state may purport to effect except in accordance
with the terms of the waiver[.]

28 U.S.C. § 1605(a)(1).

To be effective, a waiver of sovereign immunity must be
either implicit or explicit. FSIA's "waiver exception is
narrowly construed." Pere v. Nuovo Pignone, Inc., 150 F.3d 477,
482 (5th Cir. 1998).[6]

---

[6] Here, only an explicit waiver is at issue.

The district court held that the the waiver of immunity rights in the Bower Cotton pay order was "ineffective" and "condition[al]." The district court stated:

> [T]he pay order was never executed because no [THA] funds ever transferred to the disbursement account. In fact, the transaction ended with the [THA]'s decision to withhold its funds. Without the transfer of funds, there is no transaction and therefore, no pay order. Hence, there is no waiver.

Can-Am disagrees with the district court's reasoning. It claims the waiver of immunity rights in the Bower Cotton pay order is a general express waiver. The gravamen of Can-Am's argument is that the pay order is by its own terms "valid upon the commencement of the start of the transaction herein," such that the transaction began with Charles's submission of the pay order, the letter of intent, and the letter of exclusivity. Can-Am therefore claims that the THA's "decision" to withhold funds was a breach of its "obligation" to fund.

In addition, Can-Am argues that the district court's assertion that "[n]o evidence has been proffered that the Chief Secretary ever approved the contract to fund the Bower Cotton proposal" is false. It refers to the letter of intent, saying that Charles "expressly approved the transaction" by signing it. Can-Am then makes the leap that Charles approved the "contract" through the letter of exclusivity by "granting the trade program manager/administrator/facilitator full exclusive right as our

sole agent for 20 banking days . . . to enter the funds . . . in the best available bank-secured investment program."  Thus, Can-Am maintains that a contract was formed through the THA's submission of these documents.

Finally, Can-Am takes issue with the notion that the waiver is conditional on the funding of the Bower Cotton proposal.  Can-Am states, "[t]here is no language in the waiver provision or any other evidence before the district court that limits or conditions in anyway the explicit waiver."  Can-Am focuses on the word "all" in the waiver clause found in the pay order:

> This document binds all parties, their employees, associates, transfers, assigns and/or designees.  Any facsimile of this document shall be deemed as legal and binding on all parties hereto and shall be so construed to any court of law regardless of State, nation, or Province waiving <u>all</u> rights of immunity, regardless of whether diplomatic, sovereign or otherwise, which shall give this document full force and legal effect to true purpose and intent of this agreement as so construed by its signing parties.

(Emphasis added.)  Thus, Can-Am argues that the waiver clause in the pay order is explicit and unconditional.

Appellees maintain that Can-Am's argument "is based on a strained interpretation of language in a document ostensibly prepared for a transaction that never occurred . . . ."  They emphasize that without a transfer of funds in connection with the Bower Cotton proposal, there was no transaction.  Without a transaction, there is no applicable waiver.

We agree with the district court that "the alleged waiver was a limited waiver." The waiver is contained in a document that references a specific investment transaction for which there is no contract. The waiver is limited in its scope, applying solely to the Bower Cotton proposal. The pay order specifically references the code designating the Bower Cotton proposal. The word "all" in the waiver clause is also conditioned on the funding of the Bower Cotton proposal. The payment authorized by the order is conditioned on the investment transaction, which in turn relied on the THA's approval of and signature on a contract between it and the bank. There was no investment transaction in relation to the Bower Cotton proposal. Sorsby's contingency fee depended on profits generated by an investment that was never made; the THA never signed a contract with a bank in relation to such an investment. The waiver clause exists within a document that specifically relates to an investment transaction which never transpired. Thus, the waiver of "all rights of immunity" also relates to the investment transaction which never transpired. We find that Appellees did not waive their sovereign immunity.

B. Whether T&T's/the THA's conduct fits the commercial activity exception

Foreign sovereigns are not immune from judicial process in actions based upon commercial activity that has a jurisdictional

nexus with the United States, as defined by the FSIA.  Stena, 923 F.2d at 386 (citing 28 U.S.C. § 1605(a)(2)).  Because Can-Am's action is not based upon a commercial activity that has a jurisdictional nexus with the United States, Appellees remain immune.

In order to decide whether the commercial activity exception applies, first, the relevant activity must be identified.  "This requires focusing on the acts of the named defendant, not on other acts that may have had a causal connection with the suit. In particular, we must isolate those specific acts of the named defendant that form the basis of the plaintiff's suit."  De Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385, 1391 (5th Cir. 1985)(citation omitted).

Second, the court must determine if the relevant activity is sovereign or commercial.  The statutory definition of "commercial activity" is "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).[7] The second sentence of § 1603(d) directs the courts to look at

---

[7] Courts have accepted that the circular definition for "commercial activity" in § 1603(d) was a mandate by Congress authorizing the courts to define the concept on an case-by-case basis.  See H.Rep. No. 9401487, 94th Cong., 2d Sess. at 16 (stating that federal courts are given "a great deal of latitude in determining what is a 'commercial activity'" under the FSIA). The statute does give us some guidance, however, in approaching the task of distinguishing between sovereign and commercial activities, as discussed below.

the "nature" of an activity rather than its "purpose" in determining whether it is commercial.  Thus, the Supreme Court has defined an activity as having a commercial nature for purposes of FSIA immunity if it is of a type that a private person would customarily engage in for profit.  <u>Weltover</u>, 504 U.S. at 614; <u>Callejo v. Bancome, S.A.</u>, 764 F.2d 1101, 1108 n.6 (5th Cir. 1985).  A foreign government's acts may be deemed commercial when that foreign government is not acting "as a regulator of the market, but in the manner of a private player within it."[8]  <u>Weltover</u>, 504 U.S. at 614.

Finally, if the relevant activity is commercial in nature, the court must determine whether it had the requisite jurisdictional nexus with the United States.  A foreign state will not be immune in a case

> [a] in which the action is based upon a commercial activity carried on in the United States by the foreign state; or [b] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [c] upon an act outside the territory of the United States in connection with a commercial activity of the

---

[8] Courts have typically held that contracts for the procurement of goods and services are commercial rather than governmental in nature.  <u>See</u> <u>United States v. Moats</u>, 961 F.2d 1198, 1205 (5th Cir. 1992)(contract for settlement agreement is commercial); <u>Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic</u>, 877 F.2d 574, 581 (7th Cir. 1989)(contract for purchase of medical services is commercial); <u>Practical Concepts, Inc. v. Republic of Bolivia</u>, 811 F.2d 1543, 1550 (D.C. Cir. 1987) (contract for developing rural areas is commercial; <u>Tex. Trading & Milling Corp. v. Federal Republic of Nigeria</u>, 647 F.2d 300, 310 (2d Cir. 1981)(contract for purchase of cement is commercial).

foreign state elsewhere and that act causes a direct effect
in the United States[.]

28 U.S.C. § 1605(a)(2). Any one of these connections with the United States, if met, provides a sufficient basis for jurisdiction. Stena, 923 F.2d at 386.

Stena further states, "[n]ot only must there be a jurisdictional nexus between the United States and the commercial acts of the foreign sovereign, there must be a connection between the plaintiff's cause of action and the commercial acts of the foreign sovereign." Id. See also NYSA-ILA Pension Trust Fund v. Garuda Indonesia, 7 F.3d 35, 38 (2d Cir. 1993)("In construing the commercial activity exception, courts have required that a significant nexus exist between the commercial activity in this country upon which the exception is based and a plaintiff's cause of action.")(citations omitted); Moats, 961 F.2d at 1205-06; Vencendora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne de Navigation, 730 F.2d 195, 200 (5th Cir. 1984). The phrase "'[based upon'] is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." Saudi Arabia v. Nelson, 507 U.S. 349, 357 (1993). The court must therefore focus only on the conduct on which Can-Am's action is based. Id. at 356.

Can-Am's action is based on the appointment of Sorsby as

financial consultant for Appellees and the MOU defining Sorsby's
and the THA's responsibilities.  It argues that the MOU is an
enforceable contract for Can-Am's services.  Thus, Can-Am argues
that T&T and the THA are subject to jurisdiction under each of
the three parts to the commercial activity exception.

1. <u>Commercial activity in the United States</u>

Section 1603(e) of the FSIA states: "A 'commercial activity
carried on in the United States by a foreign state' means
commercial activity carried on by such state and having
substantial contact with the United States."

The district court held that Can-Am failed to present any
evidence indicating that T&T or the THA carried on any activity
that had substantial contact with the United States.  It went on
to state that none of the THA's relevant activities, including
its appointment of Sorsby as its financial consultant and its
consideration of various financing and investment proposals,
occurred in the United States.  However, Can-Am disputes this
conclusion, pointing to Sorsby's acts "as CEO of Can-Am,
conducting financial consulting services for and on behalf of
[Appellees], as their agent and financial consultant, in the
United States."  Can-Am invokes agency theory to meet the
requirement that the requisite acts be those of the named

defendant.

Appellees respond that Can-Am has not alleged anywhere that Appellees engaged in any commercial activity in the United States. Rather, they point out that all meetings between Can-Am and T&T or the THA occurred in either Trinidad & Tobago or London, and that all documents were signed in Tobago. Appellees also state that the THA "declined to participate in [an] alleged investment opportunity that would have required representatives to travel to New York and deposit funds in an unnamed bank there . . . ." Appellees do not respond to Can-Am's allegation that Sorsby was T&T's and/or the THA's agent, likely because Can-Am did not substantiate its theory.

In order for Can-Am's claim under this prong to survive, the commercial acts must be of the named Defendant. De Sanchez, 770 F.2d at 1391 (citation omitted). Can-Am argues that, as financial consultant, it acted as Appellees' agent and that its actions can be imputed to T&T and the THA.

Can-Am cites to Weltover to support its contention. But, as Appellees identified in their brief, Weltover does not conclude that the acts of the plaintiff within the United States may be attributed to the defendant to defeat sovereign immunity. Rather, it is the acts of the foreign government that determine

if the foreign sovereign's acts are "commercial" within the meaning of the FSIA. Weltover, 504 U.S. at 614-16.

The burden of proving an agency relationship, which would enable Can-Am to hold T&T and the THA liable, falls upon Can-Am. See Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines, 965 F.2d 1375, 1381 (5th Cir. 1992). "Our precedent . . . indicates . . . we look to the ownership and management structure of the instrumentality, paying particularly close attention to whether the government is involved in day-to-day operations, as well as the extent to which the agent holds itself out to be acting on behalf of the government." Id. at 1382 (citing Hester Int'l Corp. v. Fed. Rep. of Nigeria, 879 F.2d 170, 178, 181 (5th Cir. 1989)). The record does not support the allegation that Appellees, as the supposed principal to Sorsby's agent, had both the right to assign Sorsby's task and control the means and details of the process by which she would accomplish it. Can-Am did not meet its burden of proof in proving the existence of a principal-agent relationship between it and Appellees.[9]

---

[9] Can-Am also points to Texas law, citing Holloway v. Skinner, 898 S.W.2d 793 (Tex. 1995), for the proposition that the acts of an agent on behalf of the principal are deemed to be the principal's acts. Even if we chose to rely on Texas law, Can-Am's argument would fail since it does not cite any facts to show it was controlled by T&T and the THA. See Walker Ins. Servs. v.

Since Can-Am does not identify acts carried on in the United States having substantial contact with the United States by the named Appellees, we lack jurisdiction over Appellees under this prong of the commercial activity exception.

## 2. Acts performed in the United States in connection with commercial activity elsewhere

Acts of a foreign sovereign in the United States in connection with foreign commercial activity may give rise to subject matter jurisdiction. Stena, 923 F.2d at 388. In Stena, the court held that the connection between the commercial activity and the plaintiff's complaint had to be material. Id. "Any material connection between 'commercial activity elsewhere' and the plaintiff's complaints . . . is irrelevant to the determination of subject matter jurisdiction." Id. at 388. The material connection must be between the act performed in the United States and the plaintiff's cause of action. Pere, 150 F.3d at 482.

The district court disposed of Can-Am's argument with regard to this prong in one sentence, which stated that "this prong does not apply because the facts do not identify a commercial act

Bottle Rock Power Corp., 108 S.W.3d 538, 549 (App. Ct. Tex. 2003)(stating that the defining feature of the agency relationship is the principal's right to control the actions of the agent).

performed in the United States."

Can-Am argues we have jurisdiction because Sorsby traveled throughout the United States to meet and negotiate with potential investors, and that Sorsby was Appellees' agent, whose acts are imputed to Appellees. Appellees respond that since the proposed transaction with a third party never occurred, Can-Am cannot satisfy this prong of the commercial activity exception requiring that an act be performed in the United States.[10]

Can-Am asserts that its financial consulting services are the "commercial act[s] performed in the United States." In the instant case, the material connection must exist between Can-Am's financial consulting services and Appellees' alleged breach of contract, fraud, or negligent misrepresentation. First, there is a question as to whether Sorsby's acts in the United States qualify as "commercial activities." There are no cases to support the notion that investigating potential investment options constitute commercial activity under the FSIA. Second, Can-Am's allegation that it acted as an agent of Appellees is not substantiated. Third, it is illogical that plaintiff's own acts create the required material connection underlying its cause of

---

[10] Appellee's brief also correctly notes, "In fact, Can-Am fails to allege in its Amended Complaint that either T&T [or the] THA has conducted any commercial activity anywhere."

action, because, after all, Can-Am maintains that it met its end of the bargain. Can-Am does not assert that Appellees performed any other commercial activities within the United States that give rise to its cause of action.

Another possible basis for Can-Am's claim is its contingent fee based on the breach of an alleged contract entered into in Tobago. However, Can-Am's services were to be rendered in Tobago, and payment of Can-Am's contingent fee was to be paid, not from the United States, but from profits (if any) of the alleged investment program held in a Swiss bank. Therefore, we have no jurisdiction under this prong of the commercial activity exception.

### 3. Commercial activity outside the United States that has a direct effect in the United States

Finally, Can-Am argues that "the [Appellees'] breach caused a direct effect on the United States" because Sorsby, an American citizen and CEO of an American company, expected to be compensated for her work in the United States. The only direct effect claimed by Can-Am is the financial loss to Sorsby from Appellees' alleged breach.

The Supreme Court addressed the "direct effect" exception in Weltover, 504 U.S. 607 (1992). In Weltover, the plaintiffs held certain Argentine bonds. These bonds required Argentina to make

payment of principal and interest to bondholders in U.S. dollars. Payment could be made through transfer on the London, Frankfurt, Zurich, or New York market, at the election of the creditor. When the bonds began to mature, Argentina unilaterally extended the time for payment and offered bondholders substitute instruments. The plaintiffs, two Panamanian corporations and a Swiss bank, refused to accept the rescheduling and insisted on full payment, specifying New York as the place where payment should be made. The plaintiffs then brought suit in the U.S. District Court alleging that Argentina's failure to pay the bonds according to the original terms was a breach of contract. Jurisdiction was alleged under section 1605(a)(2) of the FSIA. The plaintiffs argued that Argentina's refusal to make payment caused a "direct effect" in the U.S. because payment that was supposed to have been made in New York was not made. The Supreme Court agreed. The Supreme Court stated that "an effect is 'direct' if it follows 'as an immediate consequence of defendant's . . . activity.'" Weltover, 504 U.S. at 618 (citation omitted). After noting that the plaintiffs had designated their accounts in New York as the place of payment, the Court concluded, "Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct

effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." Id. at 619.[11]

We agree with the district court that Can-Am's losses in pursuit of an acceptable investment opportunity for the Appellees are not enough to meet this prong of the commercial activity exception. Even if Can-Am did provide evidence of its financial losses, this prong still would not be met. It is undisputed that neither T&T nor the THA ever transferred money in connection with any alleged investment opportunity identified by Can-Am; hence, the type of activity found to be commercial in Weltover and other cases is absent here. Can-Am's alleged financial loss in the United States in and of itself is not enough to meet this prong of the commercial activity exception.

**IV**

Neither the waiver exception nor the commercial activity exception to the FSIA apply to Appellees. While the THA did include a waiver clause in the pay order, the pay order was

---

[11] Other examples of direct effect include when a defendant agrees to pay funds to an account in the United States and then fails to do so, Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887, 896 (5th Cir. 1998), and where a defendant's default on a letter of credit for which plaintiff had designated payment to its bank account in New York, Hanil Bank v. PT. Bank of Negara Indonesia, 148 F.3d 127, 132 (2d Cir. 1998).

conditioned on a transaction that never occurred, and the waiver itself never went into effect.  Further, Appellees did not perform any commercial activities in the United States, nor did they perform any commercial activities in the United States with a material connection to the conduct that forms the basis of Can-Am's complaint.  Finally, Appellees did not perform any commercial activities outside the United States that had a direct effect in the United States.  Because no exception under the FSIA applies, Appellees are entitled to sovereign immunity.  We AFFIRM.